# EXHIBIT A-3

4/23/2014 5:06:39 PM
Chris Daniel - District Clerk Harris County
Envelope No. 1071893
By: Sherryl Dewalt

2014-22667 / Court: 125

CAUSE NO. _____

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | HARRIS COUNTY, T E X A S |
| | § | |
| STARR INDEMNITY & LIABILITY | § | |
| INSURANCE COMPANY; NATIONAL | § | |
| UNION INSURANCE COMPANY OF | § | |
| PITTSBURGH, PA; | § | |
| THE INSURANCE COMPANY OF THE | § | |
| STATE OF PENNSYLVANIA, | § | |
| | § | |
| Defendants. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, EXXON MOBIL CORPORATION ("ExxonMobil") hereinafter sometimes referred to as Plaintiff ExxonMobil, and files this Original Petition seeking declaratory relief and damages against Defendants, Starr Indemnity & Liability Insurance Company, National Union Insurance Company of Pittsburgh, PA, and The Insurance Company of The State of Pennsylvania, and for cause of action would show the Court as follows:

### I.

### DISCOVERY PLAN

1.     Pursuant to Texas Rule of Civil Procedure 190.1, Plaintiff requests that this case be designated as a Level 3 case in accordance with the discovery control plan tailored to the circumstances of this specific suit.

Certified Document Number: 60537052 - Page 1 of 16

## II.

## **PARTIES**

2.      Plaintiff, Exxon Mobil Corporation ("ExxonMobil") is a corporation incorporated in the state of New Jersey with its principal place of business in the State of Texas.

3.      Defendant, Starr Indemnity & Liability Insurance Company ("Starr"), is an insurance company incorporated in the state of Texas, admitted, authorized, and eligible to issue liability, (fire and casualty) insurance coverage in Texas and is engaged in the business of insurance in this state. Starr may be served with process by serving CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75210.  Plaintiff requests issuance of citation and service of process on Starr at this time.

4.      Defendant, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") is an insurance company incorporated in the State of Pennsylvania admitted, authorized and eligible to issue liability, (fire and casualty) insurance coverage in Texas and is engaged in the business of insurance in this state.  National Union may be served with process by serving its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.  Plaintiff requests issuance of citation and service of process on National Union at this time.

5.      Defendant, The Insurance Company of The State of Pennsylvania ("ICSP") is an insurance company incorporated in the state of Pennsylvania admitted, authorized and eligible to write workers' compensation insurance coverage and issue workers' compensation insurance policies in the state of Texas.  ICSP can be served with process by serving its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.  Plaintiff requests issuance of citation and service of process on ICSP at this time.

2

Certified Document Number: 60537052 - Page 2 of 16

## III.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this lawsuit because the amount in controversy is within the jurisdictional limits of this Court.  Additionally, the district court has residual jurisdiction of suits for declaratory relief as the amount in controversy is in excess of the minimum jurisdictional limits of this Court.  The Court has both general and specific personal jurisdiction over Defendants as Defendants are all authorized and admitted liability insurance carriers authorized and eligible to issue liability insurance policies to Texas insureds and Defendants' business activities were purposely directed to the state of Texas and the disputes between Plaintiff and Defendants arise from and are related to those business activities.  Further, Defendants' contacts with Texas are purposeful, continuous, and systematic in that the insurance company defendants have issued numerous liability and/or workers' compensation insurance policies to multiple Texas insureds since they were authorized, eligible and/or admitted to conduct the business of insurance in Texas, including the issuance of liability policies and workers' compensation insurance policies to Savage Refinery Services, LLC, a Delaware limited liability company, which conducts substantial business and may indeed have its principal place of business in Texas.  Savage Refinery Services, LLC ("Savage") has conducted substantial business, and continues to conduct substantial business in the state of Texas.  Savage contractually agreed to make Plaintiff an additional insured on its liability insurance polices and to secure waiver of subrogation from its workers' compensation insurance carrier in favor of Plaintiff ExxonMobil.

7.      Venue is proper in Harris County, Texas pursuant to the provisions of § 15.002(a)(1) of the TEXAS CIVIL PRAC. & REM. CODE because all or a substantial part of the events giving rise to

3

Certified Document Number: 60537052 - Page 3 of 16

this insurance dispute occurred in Harris County, Texas; the insurance coverage in dispute was provided pursuant to a contract for work performed in Harris County, Texas; the workers' compensation insurance coverage in dispute was provided pursuant to a contract for work performed in Harris County, Texas; and the underlying Roberts lawsuit and bodily injury claims are based on an accident that occurred in Harris County, Texas and Plaintiff seeks coverage from the insurance company defendants as a result of that accident and suit which is filed in Harris County, Texas. Venue is also proper pursuant to § 15.002(3) of the TEXAS CIVIL PRAC. & REM. CODE in that the principal office of Defendant Starr is in Houston, Harris County, Texas. Venue is also proper because the claim against Defendant ICSP is based on waiver of subrogation rights which statutorily can only be asserted in the name of Kevin Roberts or Arturo Munoz by intervention in a third-party claim previously filed by Kevin Roberts against Defendant ExxonMobil and eventually in any suit that may be filed by Arturo Munoz which would necessarily and properly be filed in Harris County, Texas. Accordingly, venue of the underlying claim asserted by Kevin Roberts, and to be asserted by Arturo Munoz, against Defendant ExxonMobil controls venue of the waiver of subrogation dispute asserted by Plaintiff ExxonMobil against Defendant ICSP. Finally, venue is proper in Harris County, Texas pursuant to § 15.005 of the TEXAS CIVIL PRAC. & REM. CODE because Plaintiff has established proper venue against one or more of the Defendants and therefore the Plaintiff has venue over all of the Defendants and all claims or actions arising out of the same transaction, occurrence, or series of transactions or occurrences.

8.      Any attempt to remove this case to federal district court would be improper as Plaintiff Exxon Mobil Corporation is a Texas corporation with its principal place of business in Texas. Defendant Starr is incorporated in the state of Texas and therefore a citizen of the state of

4

Texas for purposes of diversity jurisdiction. Accordingly, diversity of citizenship does not exist between Plaintiff and all Defendants and 28 U.S.C. § 1332 does not apply as a matter of law. Additionally, a civil action in any state court arising under the workers' compensation laws of such state may not be removed to any district court of the United States pursuant to 28 § 1445(c).

## IV.

## CHOICE OF LAW

9. The dispute between the parties is directly related to three policies of liability insurance issued by liability insurance company defendants admitted, authorized and/or eligible to issue liability policies to Texas named insureds and additional insureds and concerns whether those policies of liability insurance provide coverage including defense and/or indemnity benefits to Plaintiff, a Texas additional insured named as a defendant in a Texas lawsuit filed by a Texas plaintiff after a Texas accident. Additionally, Plaintiff ExxonMobil's dispute with Defendant ICSP involves waiver of subrogation rights under Chapter 417 of the Texas Labor Code. Article 21.42 of the Texas Insurance Code provides:

      (a)    Any contract of insurance payable to any citizen or inhabitant of this State by any insurance company or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of the laws of this State relating to insurance, and governed thereby, notwithstanding such policy or contract of insurance may provide that the contract was executed and the premiums and policy (in case it becomes a demand) should be payable without this State, or at the home office of the company or corporation issuing same.

10. Further, Plaintiff ExxonMobil and Savage entered into a Texas contract to be governed by the laws of the State of Texas. This Texas contract supports Plaintiff ExxonMobil's demand for recognition of additional insured status on liability policies issued by Defendants Starr

Certified Document Number: 60537052 - Page 5 of 16

and National Union.  Further, the Texas contract supports Plaintiff ExxonMobil's demand that Defendant ICSP waive all rights of subrogation under Chapter 417 of the Texas Labor Code.

      11.    Texas law governs this dispute between Plaintiff and Defendants.

V.

**BACKGROUND FACTS**

      12.    On or about January 12, 2013, Kevin Roberts and Arturo Munoz were employees of Savage Refinery Services, LLC ("Savage"), working in the course and scope of their employment for Savage at the ExxonMobil Baytown Refinery at the time of the accident made the basis of bodily injury claims against ExxonMobil.  Roberts and Munoz were performing services for Savage pursuant to the Agreement for Downstream or Chemical Services with Incidental Goods No. 2088773 (sometimes referenced as A2088773) between ExxonMobil and Savage.  (Pertinent parts of the Agreement No.: 2088773 including scope of work Exhibits A and A-1 and Amendments 6 and 7 are attached hereto as Exhibit 1).  Roberts and Munoz were bolting and unbolting flanges on piping to coker drums 3 and 4 in the ExxonMobil Coker Unit pursuant to Agreement No.: 2088773 when hot water and steam exited a flange on piping on drum 3, causing injury to Roberts and Munoz. Roberts and Munoz received workers' compensation benefits under a policy of Texas Workers' Compensation Insurance issued by Defendant ICSP and insuring employees of Savage injured in the course and scope of employment for Savage.  (Pertinent parts of ICSP Policy No. WC 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 redacted as to estimated total annual remuneration and estimated annual premiums is attached hereto as Exhibit 2).

      13.    ICSP has represented that it has paid medical benefits on behalf of Roberts totaling at least $104,801.46 and medical and indemnity benefits on behalf of Munoz totaling at least

6

Certified Document Number: 60537052 - Page 6 of 16

$459,923.23. ExxonMobil made written demand on ICSP to acknowledge its waiver of subrogation rights under Chapter 417 of the Texas Labor Code which waiver Savage had contractually agreed with ExxonMobil to secure. In fact, pursuant to Agreement No.: 2088773, Savage assumed liability for securing workers' compensation insurance coverage with ICSP and paid ICSP an additional premium to secure such waiver of subrogation. Savage in turn passed the premium for securing workers' compensation insurance coverage with ICSP, including the additional premium to secure such waiver of subrogation on to ExxonMobil, in the cost to provide services under Agreement No.: 2088773. Defendant ICSP has failed and refused to acknowledge its contractual obligation to waive subrogation and wrongfully continues to assert subrogation rights under Chapter 417, including attempts to recover past benefits paid and attempts to assert a right to set off or credit against future liability for compensation benefits to be paid in the future.

14.    As noted above, Savage employees, Roberts and Munoz, were performing services on ExxonMobil premises at the time of the accident in question. Savage employees' presence, including that of Roberts and Munoz, on ExxonMobil's premises arose from work and services they performed for Savage in connection with Agreement No.: 2088773 ("Savage Contract") between Savage and ExxonMobil.

15.    Pursuant to the Savage Contract, Savage assumed liability to obtain certain insurance coverage, including its normal and customary commercial general liability insurance coverage and policy limits or at least $2,000,000.00, whichever is greater, providing coverage for injury, death or property damage resulting from each occurrence. The Savage Contract required that Savage's liability policies cover ExxonMobil as an additional insured in connection with the performance of services. The Savage Contract further requires that such additional insured coverage is primary to

Certified Document Number: 60537052 - Page 7 of 16

all other policies (including any deductibles or self-insured retentions) and self insurance which may provide coverage.

16.     Savage, through its brokers and agents, issued certificates of liability insurance representing that it maintained the liability coverages and workers' compensation coverage. Savage had assumed liability to provide under the Savage Contract. (Savage's Certificate of Insurance tendered to ExxonMobil is attached as Exhibit 3). Plaintiff ExxonMobil relied on Savage's representations of coverage and that Savage had complied with its contractual obligations. The contractual agreement to make Plaintiff ExxonMobil an additional insured was in force and effect on January 12, 2013, the date of the occurrence made the basis of Roberts and Munoz' bodily injury claims. At the time of the occurrence, Roberts and Munoz were performing services pursuant to the Savage Contract.

17.     Savage, including its risk manager, was aware of the January 12, 2013 accident and occurrence involving bodily injury to Roberts and Munoz and promptly notified its underwriters including Defendants. Thereafter, Plaintiff ExxonMobil made a prompt and appropriate demand upon all of Savage's liability insurance carriers, including Defendants Starr and National Union for recognition of Plaintiff ExxonMobil's additional insured status; for coverage in the Underlying Litigation brought by Kevin Roberts; and defense and indemnity against the bodily injury claims asserted by both Roberts and Munoz. Defendants Starr and National Union have each wrongfully disclaimed and denied its obligation for such coverage, defense, or indemnification against claims asserted by Roberts and Munoz against Plaintiff ExxonMobil. Specifically, Plaintiff ExxonMobil made a demand for coverage on the following policies:

Certified Document Number: 60537052 - Page 8 of 16

8

a.  AIG Europe Limited, formerly known as Chartis Europe Limited, which issued Liability Policy No. CU001150b to name insured Savage;

b.  National Union Fire Insurance Company of Pittsburgh, PA, Liability Policy No. 972-50-90 issued to named insured Savage;

c.  Starr Indemnity & Liability Company, Liability Policy No. MASILSE 00005012 issued to named insured Savage;

d.  National Union Fire Insurance Company of Pittsburgh, PA, Liability Policy No. 132-73-101 issued to named insured Savage.

Only AIG Europe Limited fully recognized Plaintiff ExxonMobil's additional insured status and provided coverage under its policy to ExxonMobil in the Underlying Roberts Litigation including defense and indemnity against the claims asserted in the Underlying Roberts Litigation up to its policy limit which was insufficient to meet the obligations of the Savage Contract or otherwise protect Plaintiff ExxonMobil against bodily injury claims asserted by Roberts and Munoz.

18.  Indeed, Defendants Starr and National Union have wrongfully denied coverage leaving their additional insured, Plaintiff ExxonMobil, to fend for itself against the bodily injury claims asserted by Roberts and Munoz.

19.  Plaintiff ExxonMobil has incurred and continues to incur cost and attorneys' fees to defend the bodily injury claims asserted by Roberts and Munoz.

20.  Roberts Underlying Lawsuit, Cause No. 2013-03033, styled *Kevin Roberts v. Exxon Mobil Corporation*, pending in the 165th Judicial District Court of Harris County, Texas, was set for trial the two-week period beginning March 31, 2014. Prior to trial, Roberts made reasonable, time limited demands to settle all bodily injury claims asserted against ExxonMobil in the Roberts Underlying Litigation. Plaintiff ExxonMobil once again made prompt and appropriate demand upon Defendant Starr and National Union to recognize Plaintiff ExxonMobil's additional insured status

9

Certified Document Number: 60537052 - Page 9 of 16

and respond to demands made by Roberts in the Underlying Roberts Litigation. Once again, only AIG Europe Limited honored Plaintiff ExxonMobil's additional insured status under the terms of its policy. Defendants Starr and National Union wrongfully disclaimed their contractual obligations for coverage including indemnification on behalf of Plaintiff ExxonMobil as an additional insured on their policies and refused to negotiate settlement in good faith on behalf of Plaintiff ExxonMobil, leaving Plaintiff ExxonMobil to fend for itself.

21.    As a direct and proximate result of Defendants' failure to recognize Plaintiff's additional insured status and to provide coverage including indemnification of Plaintiff against the Roberts and Munoz bodily injury claims, Plaintiff has been damaged in excess of the minimum jurisdictional limits of this Court.

## VI.

## CAUSES OF ACTION

**A.    Breach of Contract Against Defendants Starr and National Union**

22.    Plaintiff ExxonMobil incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

23.    Plaintiff ExxonMobil is an additional insured under the policies issued by Starr and National Union. Under those policies, Defendants Starr and National Union had a duty to indemnify and protect ExxonMobil against the bodily injury claims asserted by Roberts and Munoz.

24.    Plaintiff ExxonMobil has made proper notification to and demand for coverage and indemnification upon Defendants. Plaintiff ExxonMobil has complied with all necessary conditions and other terms of the policies or is otherwise excused from the performance of those conditions and terms.

10

Certified Document Number: 60537052 - Page 10 of 16

25.     Defendants' liability policies provide coverage for Plaintiff ExxonMobil against all the bodily injury claims asserted against it by Roberts and Munoz and no exclusions apply.

26.     Defendants Starr and National Union breached their policies by wrongfully denying coverage to Plaintiff ExxonMobil including indemnification against the Roberts and Munoz bodily injury claims. Indeed, knowing full well that ExxonMobil had been left on the door step, hat in hand to fend for itself against the Roberts Underlying Lawsuit, Starr engaged in a race to the courthouse and impermissible forum shopping by recently filing a declaratory judgment action against ExxonMobil in Federal Court.

27.     As a proximate result of Defendants' breach of contract, Plaintiff ExxonMobil has been damaged in an amount in excess of the minimum jurisdictional limits of the Court.

28.     As a proximate result of Defendants' breach of contract, Plaintiff ExxonMobil has been required to retain attorneys and incur fees and expenses to prosecute its rights as an additional insured, including asserting the claims in this coverage action. Plaintiff ExxonMobil has previously made demand on Defendants for coverage. Accordingly, ExxonMobil seeks to recover all attorneys' fees and expenses to prosecute this breach of contract cause of action against Defendants, Starr and National Union.

**B.     Breach of Contract - Waiver of Subrogation**

29.     In the absence of an agreement to waive subrogation, ICSP would be entitled to assert a workers' compensation lien and subrogation rights against settlement proceeds or any judgment entered against ExxonMobil in favor of Plaintiff Roberts.  Tex. Labor Code § 417.001-417.003; *Texas Mutual Insurance Co. v. Ledbetter*, 251 S.W. 3d 31 (Tex. 2008).  Here, ICSP has waived its right to recover subrogation against ExxonMobil and therefore has no basis to assert subrogation

11

rights including a workers' compensation lien for past benefits paid or a claim for set off or credit against future liability for compensation benefits against ExxonMobil or Plaintiff Roberts. *See Hartford Accident & Indem. Co. v. Buckland*, 882 S.W.2d 440, 444-56 (Tex. App. – Dallas 1994, writ denied); *Am. Risk Funding Ins. Co. v. Lambert*, 59 S.W.3d 254, 259 (Tex. App. – Corpus Christi, pet. denied); *Liberty Ins. Corp. v. SM Energy*, 2012 U.S. Dist. Lexis 174069; 2012 WL 6100303 (S.D. Tex. Dec. 7, 2012).

30.     Pursuant to Paragraph 14(a) of the contract between ExxonMobil and Savage attached hereto as Exhibit 1, Savage agreed to be liable for workers' compensation and employers' liability insurance covering its employees while performing services for ExxonMobil and further agreed that Savage and its workers' compensation carrier would waive subrogation. Savage thereafter issued a Certificate of Insurance to ExxonMobil representing that Savage had secured the workers' compensation policy in question from ICSP with the contractually required waiver of subrogation. (Exhibit 3).

31.     Pursuant to its contractual obligation, Savage paid an additional premium to add Endorsement WC420304A entitled "Texas Waiver of Our Right to Recover From Others Endorsement" to ICSP Policy No. WC 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. (*See* Exhibit 2). Pursuant to this endorsement, ICSP agreed to waive rights to recovery and subrogation rights against "any person or organization for whom the Named Insured ("Savage") has agreed by written contract to furnish this waiver." ExxonMobil is therefore a third-party beneficiary of the waiver of subrogation endorsement in the ICSP workers' compensation policy and entitled to enforce same.

32.     ExxonMobil made demand on ICSP to acknowledge waiver of all subrogation rights, including workers' compensation lien and future credit rights pursuant to the Savage Contract and

Certified Document Number: 60537052 - Page 12 of 16

the waiver of subrogation endorsement contained in the ICSP policy. Despite repeated demands, ICSP failed and refused to acknowledge its waiver of workers' compensation lien, future credit, and/or subrogation rights. Indeed, knowing full well that the above-captioned state court lawsuit in which waiver of workers' compensation subrogation would be fully decided had been filed, ICSP engaged in forum shopping by filing a declaratory judgment action against ExxonMobil in federal court.

33.     As a proximate result of ICSP's breach of contract, ExxonMobil has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

34.     As a proximate result of ICSP's breach of contract, ExxonMobil has been required to retain attorneys and incur fees and expenses to prosecute its rights under the waiver of subrogation endorsement. ExxonMobil has previously made demand on ICSP to acknowledge waiver of subrogation. Accordingly, ExxonMobil seeks to recover all attorney's fees and expenses to demand waiver of subrogation and prosecute this breach of contract cause of action against ICSP.

**VII.**

**<u>DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS</u>**

35.     Against all Defendants, ExxonMobil alleges the following alternative cause of action.

36.     Plaintiff ExxonMobil incorporates by reference each and every allegation set forth in the preceding paragraphs as though fully alleged herein.

37.     Pursuant to TEX. CIV. PRAC. & REM. CODE, Chapter 37, Plaintiff ExxonMobil requests that the Court declare rights, status and other legal relations as between Plaintiff ExxonMobil and Defendants under the contracts, liability insurance policies with respect to additional insured status, coverage and indemnity of ExxonMobil against the bodily injury claims

13

Certified Document Number: 60537052 - Page 13 of 16

of Roberts and Munoz and the workers' compensation insurance policy with respect to all waiver of subrogation issues.

38.     Specifically, Plaintiff ExxonMobil requests a declaration that:

    a.    ExxonMobil is an additional insured under the liability policies in question;

    b.    Bodily injury claims asserted against ExxonMobil by Roberts and Munoz are covered under the provisions of the policies issued by Defendants Starr and National Union;

    c.    Starr and National Union owe and have owed coverage including a duty to indemnify ExxonMobil against the bodily injury claims asserted by Roberts and Munoz;

    d.    Starr and National Union have not timely acknowledged ExxonMobil's additional insured status or otherwise provided coverage and indemnity against the bodily injury claims of Roberts and Munoz and are consequently liable to ExxonMobil for interest damages under Texas Insurance Code, Chapter 542, subchapter b;

    e.    ICSP waived all contractual and statutory subrogation rights against ExxonMobil as to bodily injury claims asserted by Roberts and Munoz;

    f.    ICSP has waived its rights under Texas Labor Code, Chapter 417 to recover from ExxonMobil for Roberts or Munoz any workers' compensation benefits paid in the past or to claim a credit or set off against compensation benefits to be paid in the future;

    g.    ICSP is not entitled to reimbursement out of the net amount recovered by Roberts or Munoz in any settlement with ExxonMobil for past benefits paid pursuant to Texas Labor Code, § 417.002(a); and

    h.    ICSP is not entitled to a statutory credit or set off against workers' compensation benefits to be paid Roberts and Munoz in the future pursuant to Texas Labor Code § 417.002(b).

39.     Plaintiff ExxonMobil further requests a declaration that it is entitled to court costs, together with reasonable and necessary attorneys' fees as are equitable and just, pursuant to TEX.

Certified Document Number: 60537052 - Page 14 of 16

14

CIV. PRAC. & REM. CODE § 37.009, and for such other declaratory judgment or decree as may be necessary and proper.

## VIII.

## JURY DEMAND

40.     Plaintiff ExxonMobil hereby demands trial by jury and has paid the jury fee with the filing of this petition.

## IX.

## PRAYER FOR RELIEF

41.     Plaintiff, ExxonMobil Corporation, requests that Defendants Starr Indemnity & Liability Company, National Union Fire Insurance Company of Pittsburgh, PA, and The Insurance Company of The State of Pennsylvania, be cited to appear and answer, and that upon trial of this case, Plaintiff ExxonMobil recover judgment for:

a.      all actual damages;

b.      reasonable and necessary attorneys' fees;

c.      declaratory relief as requested above;

d.      pre-judgment and post-judgment interest as permitted by law;

e.      all costs of Court;

f.      all other relief to which Plaintiff ExxonMobil shows itself justly entitled.

Certified Document Number: 60537052 - Page 15 of 16

Respectfully submitted,

TEKELL, BOOK, ALLEN & MORRIS, L.L.P.

*Mike Morris*

Mike Morris - 14495800
mmorris@tekellbook.com
Danny L. Van Winkle - 20462500
dv@tekellbook.com
1221 McKinney, Suite 4300
Houston, Texas 77010-2010
(713) 222-9542
(713) 655-7727 - Fax

Attorneys for Plaintiff,
EXXON MOBIL CORPORATION

16

Certified Document Number: 60537052 - Page 16 of 16



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   April 25, 2014

Certified Document Number:        60537052 Total Pages:  16

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

## STANDARD PROCUREMENT AGREEMENT FOR DOWNSTREAM OR CHEMICAL SERVICES WITH INCIDENTAL GOODS ("AGREEMENT")

### Enabling Articles Of The Agreement ("Articles")

Agreement No: __2088773__     Effective Date: __June 1, 2007__     Expiration Date:* __December 31, 2012__

*(If expiration date is blank, agreement continues until terminated by either party upon not less than 30-days prior written notice.)*

"Company": Procurement, a division of ExxonMobil Global Services Company, a Delaware corporation
"Supplier": __Marsulex Refinery Services, LLC__ _____, a _____ corporation

*1.*   *Description of Services and Pricing.*  "Services" and pricing shall be as follows:
_____
_____ or more fully described in Exhibits A and D if attached or in the applicable Order.

*2.*   *Exhibits; Addenda.*  Exhibits which are marked below are incorporated into each Order issued under this Agreement:

| | | | | |
|---|---|---|---|---|
| X | A - Scope of Work | | X | H - Drug and Alcohol Policy |
| ☐ | B - Order Form | | ☐ | I - Site Specific Attachments |
| ☐ | C -Change Order Form | | ☐ | J - Contractor Employee Hours Reporting Procedures |
| X | D - Compensation | | X | K - Workplace Harassment |
| X | E - Invoicing Procedures | | X | M - Minority/Women Owned Business Enterprise |
| X | F- Federal Contract Supplement | | ☐ | N - Background Checks for Contract Workers |
| X | G - Health and Safety Requirements | | X | R - Cellular Telephone Use |
| | | | ☐ | Other: _____ |

**EXHIBIT**
**1**

The following addenda are incorporated into each Order issued under this Agreement:  __Incidental Rental, Repair Services__

*3.*   *Notices.*  Questions, information, and any notices under this Agreement must be directed to the following addresses.  Notices regarding this Agreement by one party to the other shall be in writing and either deposited in the United States mail with first class postage prepaid, delivered in person or by private prepaid courier, or sent by facsimile with confirmation.  Either Company or Supplier may change its address below by written notice to the other party.

| | |
|---|---|
| Company: __ExxonMobil Global Service Company__ | Supplier: __Marsulex Refinery Services, LLC__ |
| Address: __5000 Bayway Drive, CAB E314__ | Address: __600 Gulf Freeway, Suite 202__ |
| City, State, Zip: __Baytown, Texas 77520__ | City, State, Zip: __Texas City, Texas 77591__ |
| Attn: __Daniel P. Byrd__ | Attn: __Beliza Kramer Stevenson__ |
| Phone: __281.834.2003__ | Phone: __409.944.3501__ |
| Fax: __414.721.0594__ | Fax: __409.944.3526__ |
| E-Mail: __daniel.p.byrd@eexonmobil.com__ | E-Mail: __bstevenson@marsulex.com__ |

*4.*   *Purpose and Operation.*  The Agreement consists of the Enabling Articles, the General Terms and Conditions, and the attached Exhibits and Addenda. The purpose of the Agreement is to provide terms and conditions to be incorporated into orders that may be issued by Affiliates (as defined in Section 1 of the General Terms and Conditions) to request Services from Supplier ("Orders"). Each Order will incorporate the terms of the General Terms and Conditions and the designated Exhibits and Addenda. The Affiliate that issues an Order ("Purchaser") is solely responsible for performance of Purchaser's obligations under such Order. Company shall not be responsible for obligations under any Order except any Order issued by Company designating itself as Purchaser. Each Order will constitute a legal contract between Purchaser and Supplier, separate and distinct from any other Order or this Agreement.

*5.*   *No Exclusivity or Minimums.*  This Agreement does not require exclusivity of business dealings by either party or commit any Purchaser to purchase any specific amount of Services.  Commitments of Affiliates to purchase, if any, are set forth in Orders.

*6.*   *Early Termination.*  This Agreement may be terminated by either Company or Supplier before the Expiration Date upon at least 60 days prior written notice to the other party.  Termination of the Agreement does not affect the rights and obligations of Purchasers and Supplier under any outstanding Orders.

*7.*   *Governing Law.*  The validity and interpretation of these Enabling Articles will be governed by the laws of the State of Texas, without reference to that State's principles of conflicts of law.  The parties hereby agree to submit to the exclusive jurisdiction of the courts of Texas, including municipal, state and /or federal courts as appropriate, with respect to these Enabling Articles.

*8.*   *Usage Reports.*  At Company's request, Supplier shall provide usage reports to Company setting out descriptions of Services provided to Purchasers, locations where Services are performed, dollars expended, and such other reasonable usage documentation as Company requests.

*9.*   *Entire Agreement; Amendment; Assignment.*  This Agreement constitutes the entire agreement between Supplier and Company concerning the subject matter hereof.  The Agreement supersedes all prior negotiations, representations, or agreements, either oral or written, related to this Agreement.  Any amendment to the Agreement must be agreed in writing by Company and Supplier.  Supplier shall not assign the Agreement, in whole or in part, without the prior written approval of Company.

*10.*   *Other Terms.*  Supplier agrees not to use any Affiliate's name, trademark or trade name publicly without written permission of Company. Supplier agrees to hold in confidence all technical and business information made available to Supplier by any Affiliate.  This Article 10 shall survive termination of these Enabling Articles.

The parties indicate their agreement below:

| | |
|---|---|
| Procurement, a division of | |
| ExxonMobil Global Services Company | Supplier: __Marsulex Refinery services, LLC.__ |
| By: _____ | By: _____ |
| Print Name: __Daniel P. Byrd__ | Print Name: _____ |
| Authorized Title: __Senior Procurement Associate__ | Authorized Title: _____ |
| Date: _____ | Date: _____ |

Certified Document Number: 60537053 - Page 1 of 19

# GENERAL TERMS AND CONDITIONS
## DOWNSTREAM/CHEMICAL SERVICES

1. **Orders.**

(a) **Nature of Order; Term.** Any Order issued hereunder must be construed in accordance with Article 4 (Purpose and Operation) of the Enabling Articles. The Order, comprising the document issued by Purchaser incorporating the terms of these General Terms and Conditions and the Exhibits and Addenda selected in the Enabling Articles, constitutes the entire agreement between Purchaser and Supplier and supersedes all prior negotiations, representations, or agreements, either oral or written, related to the subject matter of the Order. An Order may take the form of an oral request by Purchaser. The term of an Order will continue through completion of all Services under the Order, the termination date specified in the Order for all Services, or early termination as otherwise provided in the Order, whichever occurs first. For purposes of any Order, any reference in any Exhibit to "Exxon", "ExxonMobil", "User", or "Buyer" shall mean Purchaser, and any reference in any Exhibit to "Contractor" or "Seller" shall mean Supplier, unless an Exhibit has otherwise been modified in accordance with this Agreement.

(b) **Supplier Agreement.** By executing an Order, acknowledging its receipt, or engaging in any conduct (including, but not limited to, performing the Services called for by the Order) which recognizes the existence of a contract pertaining to the Services shown in the Order, Supplier agrees to the terms and conditions contained in the Order. Any terms contained in any invoice or other acknowledgment of an Order by Supplier or proposed at any time by Supplier in any manner, written or oral, which add to, vary from, or conflict with the terms and conditions in the Order are deemed to be material alterations and are objected to by Purchaser without need of further notice of objection and shall be of no effect nor in any circumstances binding upon Purchaser unless expressly accepted in writing. Written acceptance or rejection by Purchaser of any such terms or conditions shall not constitute an acceptance of any other additional terms or conditions.

(c) **Precedence Regarding Orders.** Provisions in Orders may take precedence over incorporated Agreement terms only as follows: a written Order may take precedence only for purposes of that specific Order, and only to (i) modify Services as described in Exhibit A or the Enabling Articles; (ii) modify the pricing as described in Exhibit D or the Enabling Articles to establish a lump sum price for any or all Services in place of the pricing set forth in this Agreement, or to make other modifications to pricing, except that an Order may not increase any price identified in this Agreement as a firm or a "not-to-exceed" price; (iii) add additional Services and pricing therefor; or (iv) modify or replace Exhibits E, G, I, or N. An oral Order may not take precedence over an incorporated Agreement term except to modify the Services to be provided under that specific Order as provided in this paragraph.

(d) **Precedence Regarding Agreement.** In the event of a conflict between an Exhibit and these General Terms and Conditions, these General Terms and Conditions will govern.

(e) **Definitions; "Affiliate."** Definitions provided in the Enabling Articles are effective for the General Terms and Conditions, Exhibits and Addenda. For purposes of the Agreement and any Orders, "Affiliate" means (i) Exxon Mobil Corporation or any parent of Exxon Mobil Corporation; (ii) any company or partnership in the United States in which Exxon Mobil Corporation or any parent of Exxon Mobil Corporation now or hereafter (a) owns or (b) controls, directly or indirectly, more than fifty percent (50%) of the ownership interest having the right to vote or appoint its directors or their functional equivalents ("Affiliated Company"); (iii) any joint venture in which Exxon Mobil Corporation, any parent of Exxon Mobil Corporation, or an Affiliated Company is the operator; and (iv) any successor in interest to (i) through (iii) above.

(f) **Services and Prices.** If Exhibit A or D is not incorporated, Services or prices, as applicable, are as specified in Article 1 of the Enabling Articles. Invoicing and payment terms are set out at Exhibit E, or, if Exhibit E is not incorporated, payment is due within 30 days from receipt of a correct invoice and supporting documents in accordance with Purchaser's instruction. Purchaser will not be obligated to make any payments of invoices if Supplier does not comply with required invoicing procedures.

2. **Independent Contractor.** Supplier, in performing Services and other obligations under an Order, shall be an independent contractor controlling and supervising its personnel and equipment used in performance of the Order and not the agent or employee of Purchaser. Purchaser's interest is in the completed performance of the Order. Neither Supplier nor its employees shall be entitled to participate in or receive benefits from any employee benefit plan sponsored by Exxon Mobil Corporation or any of its affiliated companies. Individuals provided to perform Services under an Order are considered "special agreement persons" under the terms of the core benefit plans of Exxon Mobil Corporation and, as such, are expressly excluded from participation thereunder. Such individuals shall not be considered "regular employees" or "non-regular employees" of Exxon Mobil Corporation or any of its affiliated companies for purposes of plan participation.

3. **Subcontractors.** Supplier shall not use any subcontractors to perform Services without written permission from Purchaser, and no such permission will relieve Supplier of any of its obligations under each Order. Supplier shall ensure that all its contracts with its subcontractors contain provisions which are in conformity with and no less stringent than the provisions of the Order. Supplier shall be responsible to Purchaser for Services performed by all its subcontractors to the same extent it is for activities performed by Supplier's employees.

4. **Warranties; Title.** Supplier warrants that: (i) it shall perform Services with due diligence and in a safe, workmanlike, and competent manner and in accordance with all provisions of the Order and applicable law; (ii) it has or shall obtain, at its expense, before performing any Services all the necessary certificates, permits, licenses and authorizations to conduct business and perform the Services; (iii) it shall ascertain, before performing any Services, whether any drawings and specifications are at variance with applicable law and good engineering and operational practices, notify Purchaser of such variances, and with Purchaser's agreement ensure that necessary changes are made; and (iv) all Services performed and goods provided shall meet descriptions or specifications provided or agreed by Purchaser, and shall be free from defect or deficiency for one year from the date of completion or acceptance, whichever occurs last. If Purchaser discovers any defect or deficiency within the warranty period, and Purchaser has notified Supplier of the defect or deficiency within a reasonable period of time after its discovery, Supplier, at its sole expense, shall at Purchaser's option promptly repair, re-perform, or replace the defective or deficient goods or Services (including all other labor, materials and other Services necessarily incidental to effecting such correction of the defect or deficiency). The repaired, re-performed, or replaced goods or Services shall be warranted on the same basis as provided above for the longer of the balance of the above warranty period, or 6 months from the date of completion or acceptance of the repair, re-performance, or replacement, whichever occurs last. Supplier shall use its best efforts to ensure that any warranties available from subcontractors or manufacturers are assigned or otherwise made available to Purchaser, and shall deliver to Purchaser a copy of each written warranty provided by subcontractors, manufacturers, or any other third parties. The warranties under an Order shall be in addition to any warranties otherwise provided by law. No payment by Purchaser shall limit Purchaser's right to later dispute any of the charges invoiced, and payment shall not be construed as Purchaser's acceptance of any Services. Unless otherwise specified in an Order, title to any goods provided under an Order

Certified Document Number: 60537053 - Page 2 of 19

will pass to Purchaser upon payment therefor by Purchaser or upon delivery to Purchaser's premises or other site designated by Purchaser, whichever occurs earlier.

5. **Taxes.** Supplier shall pay all taxes imposed against Supplier or its property or required to enable Supplier to perform the Order. All taxes, except for applicable state and/or local sales and/or use taxes shall be included in the price of the Services and goods. Any applicable state and/or local sales and/or use taxes due on Services or goods are the duty of Supplier to collect and shall be separately stated on all invoices as such. However, Supplier shall not collect or include any sales and/or use taxes on Services or goods for which Purchaser furnishes a properly completed Exemption Certificate. Supplier shall indemnify and save Purchaser completely harmless against all costs and liabilities that Purchaser may incur with respect to Supplier's failure to make any of the tax payments or take other actions specified in this paragraph.

6. **Suspension and Termination.** Purchaser may suspend or terminate Services, at any time and for any reason, by notice, written or oral, to Supplier, and Supplier shall promptly comply. In the event that Services are suspended or terminated, Purchaser shall pay Supplier only for Services performed and obligations incurred prior to the suspension or termination and for costs that Supplier directly incurs in suspending or terminating the Services, provided Purchaser has authorized such payments in advance. Purchaser may, at any time, authorize Supplier to resume any part of suspended Services by notice to Supplier, and Supplier shall then promptly comply. In no event shall Purchaser be liable for any costs, claims, damages or liabilities whatsoever of Supplier or its subcontractors including, without limitation, consequential, special or indirect damages, loss of anticipated profit or reimbursement, relating to unperformed Services.

7. **Change Orders.** Any alteration, deletion or addition to the Services in, or change in, any provision(s) of an Order shall be effective only if made in a change order or other written instrument signed by Purchaser and Supplier ("Change Order"). A Change Order, however, shall not modify any provisions of the Agreement incorporated into the Order except to the extent that a written Order is permitted to do so in Section I.C. above.

8. **Purchaser's Premises.** All of Supplier's employees, subcontractors and agents shall comply with Exhibit H, to the extent applicable, and, if entering property owned or controlled by Purchaser ("Work Site") for any purpose, shall observe Purchaser's applicable safety, health, security, and traffic policies and/or regulations, including without limitation Exhibit G, if incorporated, and changes to Exhibit G or such other policies as provided in this Section. Prior to commencing Services on a Work Site, Supplier will inspect the Work Site and ascertain whether any health or safety hazards exist which would require the use of personal protective equipment or specific operating practices in order to provide Supplier's employees, subcontractors, and agents with a safe place to work, and Supplier will ensure that its employees, subcontractors, and agents are aware of any known hazards and that they have and utilize the necessary practices and protective equipment. Purchaser may at any time, in its sole discretion, modify or replace the provisions of Exhibit G, or otherwise furnish or change health and safety requirements, by notification to Supplier either orally or in writing, without complying with any other provision regarding giving notice.

9. **Debris and Trash.** For any Services performed at Purchaser's refinery or chemical plant, Supplier shall accumulate on-site all debris and trash material resulting from Supplier's operations and keep and leave any work sites where Services are performed in a condition satisfactory to Purchaser; Purchaser shall provide instructions for disposition of all debris and trash. For Services performed at any location of Purchaser other than a refinery or chemical plant, Supplier shall at its sole expense remove all inert debris and municipal trash material resulting from Supplier's operations and keep and leave any work sites where Services are performed in a condition satisfactory to Purchaser.

10. **Liens.** Supplier shall ensure that no liens of any kind are fixed upon or against the real or personal property of Purchaser by Supplier's employees, subcontractors, or subcontractor's employees. Supplier shall indemnify, defend, protect and hold Purchaser harmless from all such claims and liens. If requested, Supplier shall furnish Purchaser with full releases (on forms satisfactory to Purchaser) of all claims and liens for labor and materials used in the performance of the Order. In addition to any rights Purchaser may have under the law, Purchaser may withhold a retainage, in an amount set forth in Exhibit D, from each payment it makes to Supplier, to be paid Supplier after (1) the Services are completed as required and the retainage period required by applicable law has expired without issuance of a lien or claim, or (2) Purchaser is satisfied that all claims have been paid and liens removed. In addition, Purchaser may, at any time, require that Supplier post a bond, at no cost to Purchaser, to remove any claims or liens, or Purchaser may discharge or remove any such claims or liens by bonding, payment or otherwise, all of which are chargeable to Supplier, together with all attorney's fees and costs. Provided Purchaser agrees in writing, Supplier may provide an irrevocable standby letter of credit, naming Purchaser as beneficiary and in form and substance satisfactory to Purchaser, in satisfaction of Supplier's obligations and liabilities as aforesaid and in substitution of any retainage.

11. **Responsibility for Property.**
(a) **Supplier's Responsibilities.** Supplier shall release and indemnify Purchaser and hold Purchaser harmless for loss of or damage, howsoever caused, to Supplier's or subcontractor's tools and equipment and rented items which are used or intended for use in the Services to be performed, and for any consequential, special or indirect damages, or loss of anticipated profits sustained by Supplier or subcontractors, **EVEN IF THE LOSS OR DAMAGE RESULTS FROM PURCHASER'S NEGLIGENCE.** Supplier shall release and indemnify Purchaser and hold Purchaser harmless for loss of or damage, howsoever caused, to (i) Supplier's, subcontractor's and Purchaser's property intended to be incorporated into the Services and (ii) Purchaser's property intended to be used in the Services, while all such property is in Supplier's care, custody or control until delivered to the Work Site, **EVEN IF THE LOSS OR DAMAGE RESULTS FROM PURCHASER'S NEGLIGENCE.**
Notwithstanding other provisions of this Agreement to the contrary, Supplier shall also be responsible and not compensated by Purchaser for: (1) any loss of money or securities in the care, custody or control of Supplier which are used or intended for use in performing Services, (2) unexplained or mysterious disappearance of any property in Supplier's care, custody or control, or shortage of any property disclosed on taking inventory, or (3) theft of property on the part of Supplier, subcontractors or their employees.

(b) Contractor shall compensate Company for loss of or damage to Company's tools and equipment and rented items at the Work Site which are (i) used or intended for use in the Work to be performed or (ii) incorporated into the Work, which results from the negligence of Contractor.

(c) **Damage to Adjacent Property.** Supplier shall compensate Purchaser for loss of or damage to Purchaser's existing property which is in reasonable proximity to the area of the Work Site where Services are performed which results from the negligence of Supplier and for any resulting consequential, special or indirect damages, or loss of anticipated profits sustained by Purchaser; however, Supplier's responsibility shall not exceed the amount recoverable by Supplier or its subcontractors under the valid and collectible insurance carried by Supplier and subcontractors, or the amount which would have been recoverable under that insurance if all conditions, requirements, and warranties imposed on the insured by the insurer are being or had been met. Purchaser shall release Supplier from liability to Purchaser for such loss or damage and for any resulting consequential, special or indirect damages, or loss of anticipated profits sustained by Purchaser exceeding the amounts so recoverable, **EVEN IF THE LOSS OR DAMAGE RESULTS FROM SUPPLIER'S NEGLIGENCE;** however, Supplier's responsibility shall include the value of any deductible or self-insured retention applicable under that insurance.

Certified Document Number: 60537053 - Page 3 of 19

12. **Third Party Indemnity.** Purchaser and Supplier shall indemnify, defend, and hold each other harmless from all claims, demands, and causes of action asserted against the indemnitee by any third party (including, without limitation, Purchaser's and Supplier's employees) for personal injury, death, or loss of or damage to property resulting from the indemnitor's negligence, Gross Negligence or Willful Misconduct. Where personal injury, death, or loss of or damage to property is the result of joint negligence, Gross Negligence or Willful Misconduct of Purchaser and Supplier, the indemnitor's duty of indemnification shall be in proportion to its allocable share of such joint negligence, Gross Negligence or Willful Misconduct. If either party is strictly liable under law, the other party's duty of indemnification shall be in the same proportion that its negligence, Gross Negligence or Willful Misconduct contributed to the personal injury, death, or loss of or damage to property for which a party is strictly liable. The term "negligence" in these General Terms and Conditions shall include active or passive negligence. "Gross Negligence" is defined by the law governing the Order; however, if such law does not define the term "gross negligence," it means any act or failure to act (whether sole, joint or concurrent) which seriously and substantially deviates from a diligent course of action or which is in reckless disregard of or indifference to the harmful consequences. "Willful Misconduct" is defined by the law governing the Order; however, if such law does not define the term "willful misconduct," it means an intentional disregard of good and prudent standards of performance or of any of the terms of the Order.

13. **Gross Negligence and Willful Misconduct.** Notwithstanding anything to the contrary in this Agreement or an Order, each party shall bear full responsibility, without limit, for its Gross Negligence or Willful Misconduct attributable to its managerial and senior supervisory personnel and, in no event, will a party be required to release or indemnify the other party for Gross Negligence or Willful Misconduct attributable to the other party's managerial or senior supervisory personnel.

14. **Insurance.**

(a) **Coverages.** Supplier shall carry and maintain in force at least the following insurances and amounts: (1) for all its employees engaged in performing Services, workers' compensation and employers' liability insurance or similar social insurance in accordance with applicable law which may be applicable to those employees; (2) its normal and customary Commercial General Liability insurance coverage and policy limits or at least $2,000,000, whichever is greater, providing coverage for injury, death or property damage resulting from each occurrence; and (3) automobile liability insurance covering owned, non-owned, and rented automotive equipment with policy limits of at least $1,000,000 coverage for injury, death or property damage resulting from each accident. (4) If Supplier performs Services in inland waters, endorsements to the workers' compensation policy (i) extending coverage to all employees engaged in performing Services subject to the U.S. Longshoremen's and Harbor Workers' Compensation Act, (ii) stating that a claim made against Purchaser and/or its underwriters by an employee of Supplier based on the doctrine of "borrowed servant" shall, for the purposes of this insurance, be treated as a claim arising under Supplier's policy, and (iii) stating that a claim "In Rem" shall be treated as a claim against the insured. (5) If Supplier performs Services offshore, endorsements (Amendment to Coverage B endorsement - maritime) to the worker's compensation policy (i) extending coverage to include maritime coverage providing limits of at least $1,000,000 per accident, and (ii) extending coverage under the U.S. Longshoremen's and Harbor Worker's Compensation Act to include coverage of the Outer Continental Shelf Lands Act. (6) If watercraft are to be used in performing Services, marine protection and indemnity insurance including coverage for illness or death of seamen providing limits of at least $1,000,000 for each occurrence with Purchaser named as an additional insured party. Notwithstanding any provision of an Order to the contrary, Supplier's liability insurance policy(ies) described above shall: (i) cover Purchaser and Affiliates as additional insureds in connection with the performance of Services; and (ii) be primary as to all other policies (including any deductibles or self-insured retentions) and self insurance which may provide coverage. Supplier and its insurer(s) providing coverage in this Section shall waive all rights of subrogation and/or contribution against Purchaser and its Affiliates to the extent liabilities are assumed by Supplier, except Supplier expressly agrees not to cause itself or its insurer(s) to waive any rights of subrogation and/or contribution against Purchaser and its Affiliates under any workers' compensation and employers' liability insurance, or similar social insurance in accordance with law which may be applicable to those employees of Supplier, when Purchaser elects to furnish or arrange same.

(b) **Other Insurance Requirements.** The above obligations of Supplier and/or its insurers shall apply to Supplier's self-insured retentions and/or deductibles. The minimum insurance requirements as set forth above shall not limit or waive a party's legal or contractual responsibilities to the other party or others. Supplier's insurance shall apply to Supplier's indemnity and defense obligations under the Order except, with respect to Services subject to the law of the State of Texas, each party agrees to maintain the insurance and limits as specified in this Section or self insurance during the duration of this Agreement in support of the mutual indemnifications, if any, agreed to in Sections 11, 12, and 13 above. Supplier shall require any subcontractors to maintain normal and customary insurance, but shall not require subcontractors to carry insurance that would duplicate the coverage of the insurance carried by Supplier or Purchaser or that would insure against liability waived by Purchaser. Upon request by Purchaser, Supplier shall have its insurance carrier(s) furnish to the requester certified copies of the required insurance policies and/or certificates of insurance specifying that no insurance shall be canceled or materially changed while Services are in progress without thirty (30) calendar days prior written notice to the requester. Upon request by Purchaser, Supplier shall have its subcontractors furnish the same evidence of insurance required of Supplier. Supplier and its subcontractors shall not begin Services until all of the insurance required of Supplier and its subcontractors is in force and the necessary documents, if requested by Purchaser, have been received by the requester.

(c) **Purchaser Alternatives.** As an alternative and at Purchaser's option and expense, Purchaser may elect to furnish or to arrange for Supplier all or any part of the insurance required in this Section. If Purchaser elects this alternative, it shall so state in a notice to Supplier, and the Supplier's compensation shall be reduced by an amount equal to the Supplier's cost of the insurance. As an alternative and at Purchaser's option and expense, Purchaser may elect to furnish or to arrange for Supplier the insurance that Supplier carries, or to assume the responsibility, for all or any part of, the property specified in Section 11(b). If Purchaser elects this alternative, it shall so state in a notice to Supplier, and the Supplier's compensation shall be reduced by an appropriate amount.

15. **Insurance and Indemnity Reformation.** If it is judicially or statutorily determined that the insurance required hereunder or the indemnities voluntarily and mutually assumed hereunder exceed the maximum monetary limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

16. **Use of Affiliate's Names and Marks.** Supplier shall not use any Affiliate's name, trade name, or trademarks in any advertising or communication to the public, or make publicity releases or announcements concerning the Order, Services, or related activities, in any format, without Purchaser's prior express written consent.

17. **Confidential Information.** Supplier shall hold in confidence all technical and business information made available to Supplier by Purchaser or Affiliates or developed or acquired by Supplier in performance of an Order. Supplier shall not, without Purchaser's prior written approval, use such information for any purpose other than performance of the applicable Order. Purchaser accepts no obligation of confidence with respect to items acquired or information disclosed, no matter how labeled, to Purchaser by Supplier unless specifically provided for in a separate, written confidentiality agreement. In the absence of any confidentiality agreement, Supplier shall not place any restrictive notices on any information, no matter the form of its recording that Supplier provides to Purchaser hereunder. Should Supplier place any notices on any drawing, record or other document, Purchaser is hereby authorized to nullify, obliterate, remove, or disregard those provisions. Supplier shall not take any photographs, videos, or other recordings of Purchaser's or Affiliates' property without Purchaser's prior written consent.

Certified Document Number: 60537053 - Page 4 of 19

18.  **Ownership of Documents, Drawings and Specifications**.  All drawings, field notes, specifications, computer programs (data files and other software in whatever form), and any other documents, records, and materials, whether written, audio, or video, developed by Supplier in connection with an Order ("Documents") shall be the property of Purchaser; provided, however that information developed by Supplier prior to commencement of performance of an Order shall remain the property of Supplier.  Supplier shall provide the original and all copies of the Documents to Purchaser when Services are completed or earlier upon Purchaser's written request.  Supplier hereby assigns, agrees to assign in the future as necessary, in the sole opinion of Purchaser, and shall require its employees and subcontractors to assign, the copyrights for all such Documents to Purchaser.

19.  **Ownership of Inventions**.  If Supplier or its personnel make any inventions, patentable or unpatentable, resulting from Supplier's activities hereunder, Supplier shall promptly disclose those inventions to Purchaser in writing.  Inventions covered in this Section shall include those conceived during the term of, and within one (1) year after completion and termination of, the applicable Order and all Services.  Further, Supplier hereby assigns each invention to Purchaser or Purchaser's designee.  Supplier also shall require its personnel to review and execute such papers as Purchaser or Purchaser's designee requests in connection with any assignment and in connection with the acquisition of letters patent, U.S. and foreign, on any inventions.

20.  **Other Intellectual Property Matters**.  For purposes of this Section, "Intellectual Property Right" means any patent, trademark, copyright, trade secret, or other proprietary right of a third party.  Supplier warrants and represents that the Services, goods, materials and articles, in the form delivered to Purchaser, including any labels or trademarks affixed thereto by or on behalf of Supplier, are free from any claim of a third party for infringement or misappropriation of an Intellectual Property Right.  Supplier shall defend at Supplier's expense and indemnify and hold Purchaser harmless against any and all expenses, liability or loss from any claim or lawsuit for alleged infringement or misappropriation of any Intellectual Property Right resulting from the manufacture, sale, use, possession or other disposition of any Services, goods, materials, or articles furnished by Supplier under the Order.  The indemnities set forth in this paragraph shall include, without limitation, payment as incurred and when due of all penalties, awards, and judgments; all court and arbitration costs; attorney's fees and other reasonable out-of-pocket costs incurred in connection with such claims or lawsuits.  Purchaser may, at its option, be represented by counsel of its own selection, at its own expense.  Supplier shall not consent to an injunction against any of Purchaser's operations, the payment of money damages, the granting of a license or the parting of anything of value by Purchaser with respect to resolution or settlement of any claim or lawsuit.

21.  **Set Off**.  Purchaser may set off any loss, damage, liability or claim that Purchaser may have against Supplier against any performance or payment due to Supplier under any Order or any other contract between the parties.

22.  **Federal Contract Clauses**.  An Order may be for supplies or services or for the use of real or personal property, including lease arrangements, which in whole or in part are necessary to the performance of any one or more contracts or federal lease agreements between Purchaser and the United States of America ("U.S. Government") or under which any portion of Purchaser's obligations under any one or more such contracts or federal lease is performed, undertaken or assumed.  Federal clauses which are applicable if Purchaser is a U.S. Government contractor or federal lease holder are contained in the Federal Contract Supplement (Exhibit F) and are incorporated into the Order, and the parties agree to the terms and conditions contained in that Supplement, to the extent applicable.

23.  **Business Standards**.  Supplier shall establish and maintain precautions to prevent its employees, agents or representatives from making, receiving, providing, or offering substantial gifts, entertainment, payments, loans, or other consideration to employees, agents, or representatives of Purchaser for the purpose of influencing those persons to act contrary to the best interests of Purchaser.  This obligation shall apply to the activities of the employees of Supplier in their relations with the employees of Purchaser and their families and/or third parties arising from an Order.  Supplier agrees that all financial settlements, billings, and reports rendered to Purchaser or its representative may be relied upon as being complete and accurate in any further recordings and reportings made by Purchaser or its representatives for whatever purpose.  Supplier shall comply and secure compliance by its subcontractors with all law applicable to the performance of any Services.  Supplier agrees to notify Purchaser promptly upon discovery of, and work with Purchaser to rectify, any instance where Supplier fails to comply with the provisions of this Section..

24.  **Data Integrity**.  Supplier shall be accountable for the integrity of any test or measurement data, including its generation, recording, reporting and retention, provided by Supplier, its agents or any subcontractors to Purchaser or any third party(s) on behalf of Purchaser.  Supplier will insure that (a) measurement activities and information reporting are complete, accurate, and timely; (b) specified industry standard test methods and instrument calibration procedures are used without modification; (c) a quality assurance system is in place for any laboratory facility involved to deter, detect and correct the generation and communication of incorrect data, and this system includes maintenance and calibration of measurement instruments; and (d) personnel involved in testing and measuring shall be trained in data generation and management.  Supplier will use a self-assessment system to insure the requirements above are being met and to resolve all problems found in the assessments.

25.  **Audit and Inspection**.  Purchaser and its representatives shall have access, at all reasonable times, to all Supplier's and subcontractor's personnel, books, records, correspondence, instructions, plans, drawings, receipts, vouchers, financial accounts, data stored in computer files or microfiche, and memoranda of every description pertaining to Services for the purpose of verifying costs of Services and Supplier's compliance with the terms of the Order.  Supplier shall maintain supporting data and accounting records in accordance with generally accepted accounting practices.  Purchaser and its representatives shall have the right to reproduce any of these documents.  Supplier shall preserve and shall cause its subcontractors to preserve all these documents for a period of three (3) years after the first to occur of (a) completion and acceptance of Services, or (b) termination of the Order.  Supplier agrees to include the necessary provisions in its contracts with subcontractors that shall assure access by Purchaser's employees or representatives to applicable records of subcontractors.  Purchaser shall not be liable for Supplier or subcontractor's costs resulting from an audit hereunder.  Purchaser may inspect any Services performed and any equipment and materials provided in connection with Services.  No inspection or approval will relieve Supplier of any warranties and obligations hereunder.

26.  **Governing Law**.  When the activities and obligations are related in any way to maritime activities, an Order will be governed by the General Maritime Law of the United States.  When general maritime law does not apply, the laws of the following state(s) will apply without reference to that state's principles of conflicts of law: (i) Louisiana, for any Order performed in whole or in part on Purchaser's premises in Louisiana, or (ii) Texas, for any Order not covered by (i).  When Louisiana law governs an Order, Purchaser (as principal) and Supplier (as direct employer) agree to recognize Purchaser as the statutory employer of employees of Supplier and its subcontractors while such employees are providing Services to Purchaser under such Order.  This provision is included for the sole purpose of establishing a statutory employer relationship to gain the benefits expressed in La. Rev. Stat. 23:1031 (C-E) and La. Rev. Stat. 23:1061(A) and is not intended to create an employer / employee relationship for any other purpose.  The following terms govern the interpretation and construction of all matters related to the sale of goods, whether or not the sale of goods is the primary purpose or an incidental purpose of the Order: (i) the terms of the Uniform Commercial Code, Article 2, as adopted by the State whose law governs the applicable Order, or (ii) where Louisiana law governs the Order, the equivalent civil code provisions in Louisiana law.  Purchaser and Supplier hereby agree to submit to the exclusive jurisdiction of the courts of the following states, including municipal, state and/or federal courts as appropriate:  (i) Louisiana, when Louisiana law governs an Order, or (ii) Texas, for an Order not governed by Louisiana law.

27.  **Management of Waste**.  Supplier and its subcontractors shall, in performing Services, have the responsibility and liability for the proper management of wastes according to all applicable laws and regulations.  In particular, Supplier and its subcontractors shall: (a) implement procedures

SPA (Enabling) Services - Downstream                                                          Page 5
07/03/06

to minimize the generation of waste including, at a minimum, process substitution, materials recovery, continued product use, and when possible, selecting less toxic alternatives to minimize hazardous waste generation; (b) consolidate (with like product) partially full containers of paint, solvent, chemicals, and other products whenever possible, to minimize waste and allow use of the remaining product; (c) ensure that any empty containers to be discarded are deemed "empty" in accordance with 40 CFR 261.7 or applicable state regulations; (d) not commingle waste they generate with any waste generated by Purchaser or others without prior written consent of Purchaser; (e) segregate hazardous waste from non hazardous waste at all times; (f) either return to the supplier for credit, or transfer to Supplier's storage facility or next job site for use, any unused and still usable materials belonging to Supplier; (g) control waste generation activities, to the extent possible, to fall within the conditionally exempt small quantity or small quantity generator regulations under the Resource Conservation and Recovery Act, as amended, and its regulations ("RCRA") and any applicable state regulations; and, (h) in addition to (a) through (g) above, for Services performed at Purchaser's refinery or chemical plant, not transfer waste to any off-site facility without Purchaser's prior written consent. Supplier and its subcontractors shall also ensure that all waste is handled in compliance with any Exhibits or Addenda relating to the management of waste that are made a part of this Agreement or any Order.

28. **Force Majeure.** For the purposes of each Order, "Force Majeure" means any event beyond the control and without fault or negligence of the party claiming inability to perform its obligations and which party is unable to prevent or provide against by the exercise of reasonable diligence, including but not limited to: acts of God or public enemy; expropriation or condemnation of facilities; changes in applicable law; war, civil disturbance, floods, unusually severe weather that could not reasonably have been anticipated; fires, explosions or other catastrophes; and strikes. Inability to pay moneys or financial hardship shall not, however, constitute events of Force Majeure. No delay or failure in performance by Purchaser or Supplier shall constitute default under the Order if, and to the extent, the delay or failure is caused by Force Majeure. Unless the Force Majeure substantially frustrates performance of the Services under the Order, Force Majeure shall not operate to excuse, but only to delay, performance of Services. If Services are delayed by reason of Force Majeure, Supplier shall promptly notify Purchaser. Supplier shall do all things reasonably possible to mitigate and remove the Force Majeure event, except a strike, and shall resume performance under the Order as soon as possible. In no event shall Purchaser be liable to Supplier and Supplier shall hold Purchaser harmless for Supplier's, subcontractor's, and their employees' damages, anticipated profits, or other sums or payments occasioned by the event.

29. **Use of Purchaser's Tools and Equipment.** Purchaser may loan or furnish tools or equipment to Supplier as an accommodation for use in connection with any Services at the Work Site. Any tools and equipment are loaned or furnished on an as is, where is basis. Supplier agrees: (a) to inspect the tools and equipment and make its own determination, before and during performance of Services, that they are adequate for the safe and efficient performance of the Services by Supplier; (b) that the tools and equipment will be loaned or furnished by Purchaser and accepted by Supplier without warranty or representation by Purchaser as to their condition or fitness for Supplier's purpose; and (c) to return the tools and equipment to Purchaser at the conclusion of use in as good condition as when received, ordinary wear and tear excepted; however, Supplier's liability for damage to the tools and equipment is limited by Section 11(a) above. Notwithstanding anything to the contrary in this paragraph or Section 11(a), Supplier shall be responsible to Purchaser for damage to or loss of tools and equipment loaned or furnished by Purchaser to the extent such damage or loss is caused by Supplier's failure to provide regular maintenance of such tools and equipment.

30. **Right of Removal.** Supplier shall promptly remove from any Work Site any employee of Supplier, any subcontractor or any employee of subcontractor performing Services under any and all Orders, as the applicable Purchaser may for any reason designate. **AS LONG AS PURCHASER'S REQUEST FOR SUCH REMOVAL IS IN COMPLIANCE WITH APPLICABLE LAW, SUPPLIER HEREBY RELEASES, INDEMNIFIES AND FOREVER DISCHARGES AND HOLDS HARMLESS COMPANY AND PURCHASER FROM ANY COSTS, CLAIMS, LOSSES, AND DAMAGES OF ANY KIND WHATSOEVER BASED ON NEGLIGENCE, DEFAMATION, WRONGFUL DISCHARGE OR OTHERWISE WHICH SUPPLIER MAY SUFFER, SUSTAIN, PAY OR INCUR AS THE RESULT OF ANY REMOVAL. HOWEVER, IF PURCHASER'S REQUEST FOR SUCH REMOVAL IS DETERMINED TO BE IN VIOLATION OF APPLICABLE LAW, PURCHASER SHALL NOT BE ENTITLED TO THE ABOVE INDEMNIFICATION.**

31. **Third Party Beneficiaries.** Any Affiliate receiving the benefits of Services provided by Supplier, directly or indirectly, shall be a third party beneficiary entitling such Affiliate to all warranties and indemnities as if the Affiliate were Purchaser as well as all other rights normally provided to a third party beneficiary.

32. **Assignment.** Supplier shall not assign an Order in whole or in part (including any sum accruing to Supplier) without Purchaser's prior written approval. No assignment, even if approved by Purchaser, will relieve Supplier of its responsibilities under the Order.

33. **Storage and Bailment of Purchaser's Materials and/or Equipment.** If Supplier or any subcontractor stores any of Purchaser's materials and/or equipment under one or more Orders, Supplier shall keep and provide those records that may be requested by Purchaser including, but not limited to, an inventory of such materials and/or equipment, by location, at the end of each calendar year, or more frequently if requested by Purchaser. Supplier shall charge Purchaser a fee for storing the materials and/or equipment only if that fee is included in Exhibit D of this Agreement, in the properly executed Order, or in a properly executed Change Order. Supplier shall: (i) store such materials and/or equipment in a clean, dry, and secure location, unless otherwise agreed in writing by Purchaser, (ii) segregate such materials and/or equipment from items belonging to entities other than Purchaser, if the materials are of a nature which may be segregated, and (iii) mark, or otherwise indicate in a manner to make it evident to Supplier's creditors, that such materials and/or equipment belong to Purchaser. Purchaser shall have access to such materials and/or equipment twenty-four hours a day, seven days a week. Supplier and Purchaser agree that delivery of Purchaser's materials and/or equipment is considered by both parties to be a bailment and not subject to the terms and conditions of the Uniform Commercial Code or similar law, as the same may be codified in applicable state law pertaining to sales and/or secured transactions. In addition to the other requirements of this Section, Supplier shall comply with Exhibit S (Storage Procedures), if incorporated.

34. **Severability; Survivorship; Waiver; Headings.** If any provision or portion of an Order shall be adjudged invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, that provision or portion of the Order shall be deemed omitted and the remaining provisions and portions shall remain in full force and effect. The provisions of an Order that by their nature continue, including, but not limited to, the warranty, confidentiality, indemnification, and allocation of liability provisions set forth in the Order, shall survive any expiration, cancellation or termination of the Order. No waiver by a party of a right or default under an Order shall be effective unless in writing. No such waiver shall be deemed a waiver of any subsequent right or default of a similar nature or otherwise. The headings in an Order are for ease of reference only and shall not be used to construe or interpret the provisions of the Order.

Certified Document Number: 60537053 - Page 6 of 19

# ExxonMobil

## AGREEMENT A2088773
### Amendment 06

Agreement A2088773, between Procurement, a division of ExxonMobil Global Services Company and Marsulex Refinery Services LLC, effective June 1, 2007 as amended ("Agreement") is hereby amended as set forth below.

1. Exhibits. Exhibit D.1 of the Agreement is deleted and replaced in its entirety by the attached Exhibit D.1 and will be effective January 1, 2012.

2. Name Change. Marsulex Refinery Services, LLC has been renamed Savage Refinery Services, LLC effective July, 1 2011.

As amended hereby, the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have duly executed this Amendment in duplicate originals.

The parties agree that a facsimile signature provided by a party is intended to serve as that party's signature to the [Agreement/Order] and creates a legally binding [Agreement/Order].

AGREED AND ACCEPTED:

| Savage Refinery Services, LLC | Procurement, a division of ExxonMobil Global Services Company |
|---|---|
| By: _____ | By: _____ |
| Name: _Steve Stewart_ <br>(Typed or Printed) | Name: _Roger L. Brants_ <br>(Typed or Printed) |
| Title: _VP and Business Unit Leader_ | Title: _Senior Procurement Associate_ |
| Date: _3-26-12_ | Date: _3-28-2012_ |

ExxonMobil Global Services Company
Beaumont Refinery, Plex #537, Room 226A
1795 Burt Street,
Beaumont, Texas 77701
Attn: Roger L. Brants

# ExxonMobil

### AGREEMENT A2088773
### Amendment 07

Agreement A2088773, between Procurement, a division of ExxonMobil Global Services Company and Savage Refinery Services, LLC effective June 1, 2007 as amended ("Agreement") is hereby amended as set forth below.  This Amendment shall be effective as of October 10, 2012.

1. **Term.**  The expiration date of this Agreement is hereby extended from December 31st, 2012 to March 31st, 2013.

2. Clarifications and Supplementary Terms and Conditions during the extension period January 1st, 2013 - March 31st, 2013:

   a. The monthly fee during the extension period will remain based on the 1,300,000 DST per year basis as defined in the current Agreement. The fee during the extension period will be subject to annual reconciliation to actual tonnage handled if a new long term enabling agreement is awarded to Savage Refinery Services, LLC.

   b. Effective January 1, 2013, the labor escalation factor will be applied to the fee schedule as defined in the current Agreement.

   c. Savage Refinery Services, LLC will continue to provide maintenance services, including parts and supplies purchased, as defined in the current Agreement; however, if any single maintenance event costs more than $40,000, ExxonMobil will reimburse Savage Refinery Services, LLC the amount above the $40,000 limit for each such event. Savage Refinery Services, LLC will consult with and seek approval from ExxonMobil prior to incurring such major maintenance costs.

   d. If a new long term enabling agreement to perform the work beginning on April 1, 2013 is not awarded to Savage Refinery Services, LLC, the turnaround costs (parts and outsourced contractor work) of turnaround work assigned to Savage Refinery Services, LLC will be reimbursed to Savage Refinery Services, LLC by ExxonMobil on a cost plus 5% basis. Parts taken from inventory must be replenished per Agreement terms without mark-up. If a new long term enabling agreement is awarded to Savage Refinery Services, LLC, then the turnaround expenses will be wrapped into the terms of the new enabling agreement.

As amended hereby, the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have duly executed this Amendment in duplicate originals.

10/09/2012 10:17 FAX 4097573882 .....* CONTRACT ADMIN ... ..... ☒002

ExxonMobil Global Services Company
Beaumont Refinery, Plex #537, Room 226A
1795 Burt Street
Beaumont, Texas 77701
Attn: Roger L. Brants

**ExxonMobil**

AGREEMENT A2088773
Amendment 07

AGREED AND ACCEPTED:

Savage Refinery Services, LLC

By: _____

Name _STEVE STEWART_
(Typed or Printed)

Title _VP AND BUSINESS UNIT LEADER_

Date _10/4/12_

Procurement, a division of ExxonMobil
Global Services Company

By: _____

Name Roger L. Brants
(Typed or Printed)

Title Senior Procurement Associate

Date _10/8/2012_

Certified Document Number: 60537053 - Page 9 of 19

A2088773 Exhibit A

- **Scope of Work –**
- **April 2010**

## OVERVIEW

ExxonMobil (Purchaser) operates a 4-drum, Conoco/Bechtel designed Delayed Coker Unit (DCU) and associated coke handling facilities at their Baytown Refinery. Purchaser intends to execute a turn-key contract for operation and maintenance of all facilities associated with heading/unheading of coke drums and with coke cutting, handling and loading of coke into customer's vessels and/or railcars.

Purchaser's DCU is a four drum unit with two separate 50% trains. Each train consists of a pair of coke drums and a coker heater. The coker is designed to produce shot coke (approximate coke density of 58 lb/ft$^3$). Each coke drum is 29' in diameter with a tangent to tangent length of 65'-5", and is designed to contain 1164 ST (short tons) of coke with a drum outage of 15' below top tangent line. Railcar loading facilities are located at the DCU, with barge loading facilities being remotely located near Purchaser's dock operations (dock 6, berth 12). Coke will be transported by third party rail to the barge loading facility.

Contractor's responsibility will include drum unhead and head, cutting coke out of drums, all handling and movement of coke from the drum structure into vessels and/or railcars, and maintenance of all cutting, unheading, handling and loading equipment throughout the entire process (excluding jet pump and decoking valve at jet pump). Contractor will also be responsible for coke fines management. Contractor's primary requirement is to safely maintain and operate all facilities to ensure that Purchaser does not incur any reduction in throughput on the Coker, or impact vessel/railcar loading which would impact customer deliveries or result in demurrage charges or other additional cost to Purchaser.

**Contractor's scope of Operations and Maintenance Work shall include, but not necessarily be limited, to the following:**

### Coke Drum Unheading/Cutting/Reheading

The coke drums will be turned over to the Contractor after cooling and isolation by Purchaser. Contractor will manually unhead the Top Head. Bottom unheading will be done by the Contractor with remote Hahn and Clay Bottom Unheading Devices which includes a hydraulic Grayloc Clamp on the feed line. Coke will be drilled by the Contractor using a coke water cutting system. This system includes the rotary joint, flexible hose, drill stem, drill bit, hydraulic drive system and gear boxes, hoist equipment, drill stem flanges and the safety interlocks. Coke cutting will be controlled from 1 of 2 operator enclosures (buildings) at the top of the coke

Certified Document Number: 60537053 - Page 10 of 19

A2088773 Exhibit A

drum structure. These buildings are to be maintained by the Contractor. The coke cutting operation must be completed in a time window that will not interfere with drum cycle times. Purchaser will maintain operational control and maintenance of the decoking jet water pump.

Contractor will rehead the top and bottom heads and turn the drum back over to Purchaser. Purchaser will inspect the bottom head gasket and Grayloc ring and surfaces prior to Contractor reinstalling. Purchaser will provide the Grayloc rings. Purchaser will perform a tightness testing on the drum prior to reintroducing feed.

## Coke Pit Reclaim

Coke that has been cut from the coke drums together with the water from the cutting operation will be collected in the coke pit. Coke in the pit will be reclaimed by a P&H overhead, rail mounted clam shell bucket crane (25 cu yd), which lifts the coke out of the pit and moves it to the pad area for dewatering. Purchaser and Supplier will work together on a Best Efforts basis to maintain coke pit levels so as not to impact coker throughput, or create a safety concern. If a change in normal operations and/or work processes impact coke pit inventory or pad inventory levels is Purchaser's fault that then any cost to remedy will be Purchaser's responsibility. If a change in normal operations and/or work processes impact coke pit inventory or pad inventory levels is Supplier's fault that then any cost to remedy will be Supplier's responsibility. If a change in normal operations and/or work processes impact coke pit inventory or pad inventory levels is Purchaser's and Suppliers shared fault that then any cost to remedy will be Purchaser's and Supplier's shared responsibility based on a mutually agreeable negotiation.

Coke from the pad will be moved by the same overhead rail crane to a 1000 cu-ft (27 ton) feed hopper/grizzly after it has been de-watered. Coke from the feed hopper feeds into a vibrating feeder conveyor with a magnetic metals separator. The conveyor feeds into a crusher which reduces the coke to a 2" max size. The crusher feeds onto a conveyor with a belt scale and automatic sampler. The conveyor discharges into a 300 ton silo for rail car loading. The Contractor will prepare all samples, and will notify a 3rd party for pickup of samples for analysis.

## Railcar Loading

The railcar loading silo is equipped with a Pebco loading system for loading railcars. Railcars will be positioned for loading by the Contractor and marshaled at the DCU site by the Contractor. Railcar movements to and from the DCU to other parts of the refinery or offsite disposition will be done by Purchaser's in-plant rail Contractor. Contractor will be responsible for coordination of all movements with the in-plant rail Contractor. If malfunction of purchasers operated and maintained equipment is at purchaser's fault, then any cost associated with coke movement will be at the purchaser's responsibility. If malfunction of purchaser's equipment is at supplier's fault, then any cost associated with coke movement will be at supplier's responsibility. If malfunction of purchaser's equipment is shared, then any cost associated with coke movement will be shared based on a mutually agreeable negotiation. The railcars will be weighed by the railcar scale at the DCU site for material balance and custody transfer purposes.

6/1/07

Certified Document Number: 60537053 - Page 11 of 19

A2088773 Exhibit A

Weighing of the railcars after loading must meet Purchaser's product accounting requirements, with a daily loading report being faxed to Purchaser product accounting dept. Scale calibrations will be by Purchaser approved 3rd party specialist. A railcar wash facility, operated by Contractor, is provided at the hopper loading station to clean cars, as required. Contractor will furnish for in-plant coke transport and will provide railcar maintenance in accordance with applicable safety standards.

## Barge Loading

Barge shipments require that Contractor provide and maintain a fleet of railcars sufficient to move Coke from the DCU to the dock loading facilities to meet Purchaser's barge shipment requirements. Railcars will be transported from the DCU to the dock loading area by the Purchaser's in-plant rail Contractor. All coke rail movements are to be coordinated by Contractor with in-plant rail movement Contractor. Contractor will provide railcar marshalling equipment to move the railcars through the loading and unloading systems. Purchaser will ensure that proper draft is available for the vessels at the Coke Dock.

At the dock loading facilities, Contractor will position cars in the unload building over a subsurface unload pit. The pit design allows for unloading of all compartments of the car without repositioning the car. Cars will be bottom dumped into a 70 ton hopper which feeds a belt feeder and transfer conveyor. The first transfer conveyor feeds onto a second transfer conveyor which feeds subsequent vessel loading facilities, or alternatively can feed a manual push radial stacker to a coke pile site. The coke pile site has a maximum capacity of 15000 tons and is intended for use only for significant equipment outages or barge delays. Reclaiming from the coke pile is by mobile equipment (supplied by Contractor), which reloads the Coke back into the rail unload pit hopper. The second transfer conveyor leads to a third conveyor. This conveyor feeds a shuttle conveyor at Purchaser's Dock 6, berth 12, for loading coke onto barges up to 3500 ton. Barge loading will use a shuttle boom conveyor at the dock. Contractor will use a Purchaser provided barge puller for shuttling the barge. Contractor will coordinate barge movements with customers barge and tug company and with Purchaser's Dock Scheduler, and be responsible for timely loading operations. Valid demurrage charges will be to Contractors account. Barge draft measurements for custody transfer will be performed, per customer requirements, by a 3rd party contractor and coordinated by Contractor. Contractor will notify 3rd party to pick up sample for analysis. Contractor will coordinate sample handling requirements with Purchaser's coke buyer(s).

## Operation / Maintenance Performance Requirements:

Contractor shall operate and maintain all equipment in a competent and workmanlike manner to maintain 24 hour, 7 day per week operations of the DCU and meet Purchaser's shipment requirements unless Purchaser's actions alter Supplier's ability to meet requirements. Operations include all facilities for deheading the drums, cutting coke from the drums, reheading the drums, transferring coke from the coke pit to the pad for de-watering, thence onto conveyor and silo for railcar loading, and thence into railcars. For barge shipments the Contractor shall

Certified Document Number: 60537053 - Page 12 of 19

A2088773 Exhibit A

operate and maintain the equipment required for unloading railcars into the hopper, thence onto the conveyor, thence into barges.

Prior to operations, Contractor will be required to develop detailed Job Hazard Analysis (JHA), operating procedures and maintenance procedures for all aspect of Contractor's scope. All procedures will be reviewed by Purchaser for compliance with refinery Safety, Health and Environmental (SHE) standards and practices. Maintenance and updating of procedures will be within Contractor's ongoing responsibilities. Contractor will document and maintain employee training records, refresher training records, etc. and shall make these available to the Purchaser upon request. All facility and/or operational modifications are to incorporate Purchaser's Management of Change procedures. Modifications by Purchaser or Contractor shall be discussed between both parties prior to start. Job Safety Analysis will be reviewed annually by the Purchaser.

Contractor will be responsible for maintaining these operations and, as required, providing and operating any and all temporary facilities and equipment needed to sustain these operations during equipment maintenance periods or breakdowns.

All Facilities operated by Contractor and/or required to sustain Contractor's DCU and coke handling operations shall be maintained by Contractor. In general Contractor will be responsible for equipment up to and including its primary isolation point (as mutually agreed to by Purchaser and Contractor). Rail maintenance at the Coker Unit, loading scales, and Rail Car Unloading Facilities will be maintained by the Contractor (see page 3 exhibit A-1).

In the event Contractor fails to meet either safety requirements, or fails to perform operation or maintenance needs that impact the DCU throughput, Purchaser reserves the right to intervene to restore operational objectives. All additional cost incurred by Purchaser will be recoverable and to Contractor's account.

## General - Additional Contractor Requirements

Contractor must warrant that its performance hereunder shall be conducted in a safe, efficient, and lawful manner in conformity with the best practices of its type of work, and in accordance with applicable Purchaser Standard Job Rules and Safety Regulations as currently set forth in Exhibit "G" attached to the Agreement or modifications thereof.

Contractor shall provide at its own expense, sufficient full-time, duly qualified personnel necessary to supervise, operate and maintain the Facility as agreed hereunder.

Contractor shall, in a good and workmanlike manner, maintain, or procure the maintenance of, all equipment operated by Contractor to manufacturer's recommendations, as a minimum.

A2088773 Exhibit A

The bridge crane and drum unheading system maintenance and repairs are to be subcontracted to the manufacturer or a qualified specialty equipment maintenance contractor, if not, Contractor is to provide an acceptable alternative plan to Purchaser for maintenance and repair.

Formal documented records of maintenance are to be maintained by Contractor, with the Purchaser retaining the right to inspect records at any time during normal business hours.

Contractor shall develop a plan (to be approved by Purchaser) for maintaining operational facilities for all equipment required to sustain DCU operations without impacting unit throughput.

Testing and analysis of Coke shall be performed by a 3rd party contractor with coordination and cooperation of Contractor in accordance with customer requirements, as approved by Purchaser. Contractor will secure samples, split between Purchaser/Customer, package, tag, and ready for delivery by a 3rd party contractor or delivery to Baytown Refinery in-plant Laboratory. Inspection of customer's rail cars and barges, prior to loading, will be performed by the Contractor. Purchaser will be promptly advised by Contractor of any inspection irregularities and will advise Contractor on an appropriate course of action. Demurrage time shall not count until the irregularities have been removed.

Contractor shall have all responsibility for the cleanliness of coke drum structure, conveyors, hoppers, spouts, equipment, or devices that are part of the equipment and berth.  As such, Contractor shall ensure that all equipment to be used to handle Purchaser's Coke are properly cleaned and maintained to ensure environmental compliance and optimum equipment performance and life.  In the event of a spill in transit, due to negligence of Contractor's actions or inaction, Contractor is responsible for recovery, cleanup and any and all cost.  Contractor shall develop a spill response plan to handle coke spills in a timely manner.  Should Contractor's spill response be inadequate or not timely, Purchaser will perform the requisite cleanup and charge the cost to the Contractor's account.

Contractor shall Perform routine cleanup inside Loading control room, Railroad spurs, and operating shelters.

Contractor shall operate and maintain de-watering facilities to assure coke does not migrate beyond control facilities.  Cutting water and quench water reclaiming and fines management is Contractor's responsibility.

All coke handled by Contractor shall be and remain the sole property of Purchaser, or its customers, and Contractor shall have no claim or interest therein.  Contractor shall make every reasonable effort to use all due diligence to preserve and safeguard Purchaser's, or its customer's, title to its coke and to protect such title from creditors of Purchaser.  Upon written request of

Certified Document Number: 60537053 - Page 14 of 19

Purchaser, Contractor shall execute such instrument(s) that Purchaser may reasonably require to evidence Purchaser's or its Customer's, ownership of such materials.

Purchaser shall have the right, at all times, to enter all areas including the coke storage area to survey the quantity and quality of the coke on hand, to observe and inspect Contractor's performance in handling of said coke, and to do all such other things as may be necessary or reasonable in connection therewith to the extent that such activities do not unreasonably interfere with Contractor's activities.  Contractor shall fully cooperate with Purchaser's representative(s) and Purchaser shall comply with Contractor's applicable work rules which have been approved by Purchaser.

Should Purchaser contract, hire, designate, or assign an outside party to observe collection of, and/ or measure or test samples of Coke collected by Contractor, said outside party shall have the right, at all reasonable times, to enter the area as directed by Contractor, on behalf of Purchaser as stated hereunder, to the extent that such activities do not unreasonably interfere with Contractor's activities.

Purchaser shall provide reasonable utilities and facilities at no cost to the Contractor, including the following:

- Space at the Facility for Contractor to locate a temporary office/ changing building and a temporary equipment repair facility.
- Purchaser will provide Contractor with internal phone service, and/ or will provide access for Contractor to obtain outside phone service.
- Purchaser shall install potable water to Contractor's office/ changing building.  Contractor shall be responsible for maintenance of this line.
- Contractor shall install necessary sewer line with Purchaser making final connection to Purchaser's existing lifting station.  Contractor will be responsible for maintenance of all lines.

## Work Requiring Permits

All Hot Work, Enclosed Space Entry, and work requiring Energy Isolation must be permitted by Purchaser.   A general work permit will be issued annually to Contractor for normal operations and maintenance not requiring hot work, equipment isolation, confined space entry or independent inspection.

Contractor receiving permits must attend and pass permit recipient training provided by Purchaser.

To ensure appropriate reviews, in accordance with OSHA PSM requirements, Purchaser's Management of Change (MOC) process will be followed for all changes to operating procedures or facilities.

6/1/07

A2088773 Exhibit A

### Spare Parts

Procurement, warehousing and management of all spare parts required for operations is the responsibility of Contractor, except for the extent that Purchaser will provide;

  (a) Grayloc Rings
  (b) Coke drum bottom and top head gaskets
  (c) Initial inventory of spare parts at startup

Contractor will develop the initial Purchaser owned inventory of spare parts at startup and stock them separately in their Parts Warehouse. Contractor will ensure that the Purchaser's owned inventory of spare parts are easily identified from Contractor's own spare parts. Contractor is not required to store the Purchaser's owned inventory of spare parts separately from the Contractor's own spare parts. The spare parts supplied by the Purchaser from start up and one year operation will be considered as inventory, with Contractor to replenish after use.

The initial spare parts inventory supplied by Purchaser will remain as Purchaser property, but controlled and inventoried by Contractor. Upon termination of contract, Contractor will return the same inventory of spare parts to Purchaser. Formal documented records of spare parts inventory are to be maintained by Contractor, with the Purchaser retaining the right to inspect records at any time during normal business hours.

ExxonMobil / Marsulex Contract Renewal
Scope and Pricing Changes
April 2010

### Contract Dates:
Start:   6/1/2007
End:    12/31/2012

In addition to the Work Scope in Exhibit A, Marsulex will provide the additional services for routine operation and maintenance identified below. The turnaround work scope listed below and on the Attachment 2 - Marsulex Turnaround Worklist will be completed by Contractor for Purchaser's 2008 DCU Turnaround.

In the case of a conflict between Exhibit A and A-1, Exhibit A-1 will supersede Exhibit A

### Hydroblasting Services, Pall Filter Services, Clean-Up Services, and Current Efficiencies:
- Marsulex will provide general hydroblasting services, including but not limited to:
  - 30 in coke drum vapor outlets - 4 each – monthly
  - 30 in coke drum vapor lines horizontal piping runs - 8 each – annually
  - 12 in coke drum feed lines - 4 each - 2 times/ year
  - 2" pass outlet drain valves - 8 each – annually
  - Various 1.5" & 2" closed drain lines at switch deck - possibly one/month
  - Ejectors - 4 each - 2 times /year
  - Other miscellaneous hydroblasting requests as discussed and agreed upon
- Marsulex will be responsible for Pall Filter changeouts (Fil-605A/B/C), for having the filters cleaned, and for storage of clean, spare filters:
  - Approximately 1 Pall filter per month, as needed by ExxonMobil
  - Marsulex will provide metalscraft work, insulation work, I&E work, gaskets, all safety equipment pertinent to the job and freight to and from Southern Metals
  - Marsulex will coordinate the crane and the crane operator through Jacobs. ExxonMobil will pay for the crane and the crane operator through a direct-billed work order for Jacobs
  - ExxonMobil will pay for the Southern Metals cleaning charges, new bolts when required, and the Team torquing charges through a re-bill of actual charges from Marsulex
  - ExxonMobil will still be responsible for replacement of and/or repair of the Pall Filters for design changes or failures/damages that are not caused by Marsulex. Marsulex will be responsible for any damages caused by Marsulex
- Marsulex will provide general cleaning services of the entire DCU unit area.
- Marsulex will continue to provide services to the DCU which have been added to the work scope over the prior contract period as efficiencies. Those services include:
  - Fil-602A/B flange removal, basket removal, pressure washing or steam cleaning, basket installation, and flange replacement. Repair brackets if possible. ExxonMobil supplies strainers and bolts. Marsulex to purchase and store gaskets
  - Fil-603A/B flange removal, basket removal, pressure washing or steam cleaning, basket installation, and flange replacement. Repair brackets if possible. ExxonMobil supplies strainers and bolts. Marsulex to purchase and store gaskets
  - Fil-604A/B flange removal, basket removal, cleaning and installation, and flange replacement. ExxonMobil supplies the strainers and bolts. Marsulex to purchase and store gaskets
  - STR-610 flange removal, basket removal, cleaning, installation of basket, and flange replacement. ExxonMobil supplies the bolts. Marsulex to purchase and store gaskets
  - Top coke drum thermowell removal, cleaning, and installation. ExxonMobil supplies the thermowells, bolts, and gaskets

ExxonMobil – Marsulex Contract Renewal 2007
A2088773 Exhibit A-1

> Coke drum 10" overhead vapor line flange removal and reinstallation. ExxonMobil supplies the gaskets and bolts
> Coke drum 3" top steam ejector flange removal and reinstallation. ExxonMobil supplies the bolts. Marsulex to purchase and store the gaskets
> STR-614A/B flange removal, basket removal, pressure washing or steam cleaning, basket installation, and flange replacement. Repair brackets if possible. ExxonMobil supplies strainers and bolts. Marsulex to purchase and store gaskets
> STR-615A/B flange removal, basket removal, pressure washing or steam cleaning, basket installation, and flange replacement. Repair brackets if possible. ExxonMobil supplies strainers and bolts. Marsulex to purchase and store gaskets
- Marsulex will provide hydroblasting services, clean-up services, and Pall Filter services

## Drum/Filter Gaskets:
- Marsulex will purchase, store, and manage the inventory of drum and filter gaskets, including:
  > 72" bottom head gasket
  > 36" top head gasket
  > 24" #150 S/W gasket
  > 24" #300 S/W gasket
  > 18" #150 S/W gasket
  > 16" #150 S/W gasket
  > 3" #150 S/W gasket
  > Pall Filter gaskets

## Railcars:
- Marsulex will maintain a minimum in-service fleet of 32 railcars at all times, meaning up to 4 railcars can be out of service at any given time for repairs, servicing, etc. Railcars that are out of service for reasons out of Marsulex's control (e.g. Rescar damages) will not count against Marsulex's 4 allowable cars out of service
- ExxonMobil and Marsulex agree to assign lease of all 36, functioning and in good condition, leased railcars to ExxonMobil from Marsulex if/when the ExxonMobil/Marsulex contract is terminated or not renewed

## Equipment Investment for Contract Period:
- Marsulex to expend capital in 2007 to upgrade Marsulex owned equipment to ensure reliability for the next contract period, including 2 railcar moving equipment, rail car repairs (doors), radios, forklift, PPE, office repairs (Red Barn), etc.
- Marsulex will continue to be responsible for providing and maintaining office space for Marsulex. Currently, ExxonMobil allows Marsulex to use the "Red Barn" for office space. Marsulex will continue to be responsible for all maintenance of the Red Barn or any other office space

## DCU 2008 Turnaround (1st Quarter):
- See separate T/A worklist, which was jointly developed by ExxonMobil and Marsulex using the ExxonMobil equipment strategy approach. Marsulex estimate of work is ███████ including tax and ███ contingency to cover scope and/or cost changes
- Marsulex to select, procure, and install/coordinate/execute all Marsulex T/A work
- ExxonMobil retains ownership if/when the contract is terminated or not renewed
- In the event the contract is terminated before 12/31/2012, ExxonMobil will reimburse Marsulex the portion of the Turnaround expenses which has not yet been reimbursed through annual fees. The reimbursement amount will be a prorated calculation (the number of years between the date of termination and 12/31/2012) X (█████/yr)
- Where specified in the Turnaround worklist, the actual cost of certain repairs will be re-billed to ExxonMobil. The scope and cost of these repairs will be approved by ExxonMobil before Marsulex executes the repairs. Where not specified, Marsulex will be responsible for

Certified Document Number: 60537053 - Page 18 of 19

ExxonMobil – Marsulex Contract Renewal 2007
A2088773 Exhibit A-1

completing the T/A items, regardless of scope or cost changes from the assumptions made in the worklist

Notes:
- Equipment responsibility drawings have been updated by David Knutson (ExxonMobil Day Supervisor) and Nick Robinson (Marsulex Facility Manager) – at the time of this contract. Both ExxonMobil and Marsulex will keep copies of these drawings
- Marsulex will retain responsibility for the DCU rail tracks, with the exception of the approach track to the scales and load-out building on the DCU and the approach track to the hopper at the Docks
- Marsulex will continue to operate and maintain all equipment within their responsibility, including repair or replacement of any equipment on the Spare Parts list.



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   April 25, 2014

Certified Document Number:        60537053 Total Pages:  19

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

2014-22667 / Court: 125

ISSUED BY THE STOCK INSURANCE COMPANY HEREIN CALLED THE COMPANY

THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA
13889

| AGENT NUMBER | POLICY NUMBER |
|---|---|
| 0045894-00 | WC  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 |
| | 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-20 |

INCORPORATED UNDER THE LAWS OF    PENNSYLVANIA
ITEM 1.    NAMED INSURED    MAILING ADDRESS    IDENTIFICATION NO.

SAVAGE SERVICES CORPORATION
6340 S 3000 E STE 600
SALT LAKE CITY, UT 84121-3560

SEE EXTENSION OF ITEM 1. OF THE INFORMATION PAGE – WC990610
ID# 910524917

CHARTIS

A Chartis company

EXECUTIVE OFFICES:
175 Water Street
New York, NY 10038

EXHIBIT
2

PRODUCERS NAME AND ADDRESS

MARSH USA INC (UTAH)
15 W SOUTH TEMPLE
STE 700
SALT LAKE CITY, UT 84101-1533

**WORKERS COMPENSATION AND EMPLOYERS
LIABILITY POLICY INFORMATION PAGE**

INSURED IS
CORPORATION

PREVIOUS POLICY NUMBER
RENEWAL    009876293

OTHER WORKPLACES NOT SHOWN ABOVE:    SEE EXTENSION OF ITEM 1. OF THE INFORMATION PAGE – WC990610

| ITEM 2 | POLICY PERIOD 12:01 A.M. standard time at the insured's mailing address | FROM  04/01/12 | TO  04/01/13 |
|---|---|---|---|

ITEM 3
A. Workers Compensation Insurance: Part One of the policy applies to the Workers Compensation Law of the states listed here:

AL AR AZ CO CT DE GA IA IL IN KS KY LA MD ME MI MT NC NE NJ NM NV NY OR PA TN TX UT VA WV

B. Employers Liability Insurance: Part Two of the policy applies to the work in each state listed in Item 3.A.
The limits of our liability under Part Two are:

Bodily Injury by Accident $ ___1,000,000___ each accident
Bodily Injury by Disease $ ___1,000,000___ policy limit
Bodily Injury by Disease $ ___1,000,000___ each employee

C. Other States Insurance: Part Three of the policy applies to the states, if any, listed here:

AK DC HI ID MA MN MO MS NH OK RI SC SD VT WI

D. This policy includes these endorsements and schedules:
SEE EXTENSION OF ITEM 3.D. OF THE INFORMATION PAGE – WC990612

ITEM 4
The premium for this policy will be determined by our Manuals of Rules, Classifications, Rates and Rating Plans.
All information required below is subject to verification and change by audit.

| Classifications | Code Number | Premium Basis Total Remuneration [X] Annual ☐ 3 Year | Rate Per $100 Of Remuneration | Estimated Premium [X] Annual ☐ 3 Year |
|---|---|---|---|---|

SEE EXTENSION OF ITEM 4. OF THE INFORMATION PAGE – WC7754
TAXES/ASSESSMENTS/SURCHARGES

EXPENSE CONSTANT (EXCEPT WHERE APPLICABLE BY STATE)    IL

MINIMUM PREMIUM    AZ    TOTAL ESTIMATED ANNUAL PREMIUM

If indicated below, interim adjustments of premium shall be made:

☐ Semi-Annually    ☐ Quarterly    ☐ Monthly    DEPOSIT PREMIUM

04/27/12 LOS ANGELES    05

Issue Date    Issuing Office    Authorized Representative    WC 00 00 01A

35997 (Rev'd 04/08)

Certified Document Number: 60537054 - Page 1 of 11

## EXTENSION OF ITEM 3.D. OF THE INFORMATION PAGE

Policy Number: WC   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                    Effective Date:   04/01/2012

| | |
|---|---|
| WC070601 | DE NON RENEWAL ENDORSEMENT |
| WC100601A | GA CANCELLATION NON RENEWAL AND CHANGE |
| WC991001 | GA NOTICE OF ELECTION OR REJEC OF WC COV |
| WC991002 | GA ADV NOTICE OF CANC OR NON-REN EXTD |
| WC991003F | GA OFFER OPTIONAL DED FOR CLAIMS BENEFIT |
| WC120601D | ILLINOIS AMENDATORY ENDORSEMENT |
| WC991202A | IL NOTICE TO POLICYHOLDER |
| WC991203 | IL AMD. ENDT. FOR CONTRIBUTION LIABILITY |
| WC991204 | IL LOSS REIMBURSEMENT ENDORSEMENT |
| WC991205 | IL ONLY-ADV NOT OF CANC OR NON-REN BY US |
| WC991206 | IL POLHLDR DISCLS IND COMM OPER FUND SUR |
| 6295BWC | IN NOTICE TO POLICYHOLDERS |
| 58964WC | KS WORKERS COMP INFO FOR EMPLOYERS |
| WC150401 | KS FINAL PREMIUM ENDORSEMENT |
| WC150601A | KS CANCELLATION AND NONRENEWAL ENDT |
| WC59269 | KS SPANISH WC INFO FOR EMPLOYERS |
| 60713WC | KY ADDENDUM TO APPLICATION |
| LWNKYNOTE | KY NOTICE OF RATE INCREASE |
| WC160305 | KY PART ONE WORKERS COMP INS ENDT |
| WC160601 | KY CANCELLATION AND NON-RENEWAL ENDT. |
| WC991601A | KY AMENDTORY ENDT. ADDENDUM TO WC990002A |
| WC170303 | LOUISIANA DUTY TO DEFEND ENDORSEMENT |
| WC170601D | LOUISIANA AMENDATORY ENDT. |
| WC170602A | LA COST CONTAINMENT ACT ENDT |
| WC991702 | LA AMENDATORY ENDT ADDENDUM TO WC990002A |
| 77431 | MAINE AMENDATORY ENDORSEMENT |
| WC180601 | MAINE INSPECTION IMMUNITY ENDORSEMENT |
| WC180603A | MAINE CANCELATION AND NONRENEWAL ENDT. |
| WC180604 | MAINE FINAL PREMIUM AUDIT ENDORSEMENT |
| WC180606 | MAINE NOTICE OF FILING OF FIRST REP ENDT |
| WC180607 | ME SUPPLEMENTAL BENEFITS FUND ENDT. |
| WC190601E | MD CANCELLATION AND NONRENEWAL ENDT. |
| WC210303A | MI NOTICE TO POLICYHOLDER ENDT |
| WC210304 | MI LAW ENDORSEMENT |
| WC69395 | MO POLICY HOLDER'S NOTICE |
| WC250305 | MT INTENTIONAL INJURY EXCLUSION ENDT |
| WC250601A | MT CANCELLATION AND NONRENEWAL ENDT. |
| WC250602 | MT SAFETY ENDORSEMENT |
| WC260601C | NE CANCELLATION & NONRENEWAL ENDORSEMENT |
| WC270601C | NV CANCELLATION AND NON RENEWAL ENDT |
| WC992702 | NV ADV NOTICE OF CANC OR NON-REN EXTD |
| LWNNJSIF | NJ SECOND INJURY FUND |
| LWNNJUEF | NJ UNINSURED EMPLOYER FUND |
| WC290306B | NJ PART II EMPLOYERS LIABILITY ENDT |
| WC290307 | NJ SOLE PROPRIETORS & PARTNERS COVERAGE |
| WC290601A | NJ LARGE RISK - LARGE DEDUCTIBLE |
| WC300301 | NM SAFETY DEVICE COVERAGE ENDORSEMENT |
| WC300601 | NM CANCELLATION AND NONRENEWAL ENDT |
| WC310308 | NY LIMIT OF LIABILITY ENDORSEMENT |
| WC310313B | NY SOLE PROPRIETORS & PARTNERS COVERAGE |

WC 99 06 12
(Ed. 1/97) (Rev'd 04/08)

Certified Document Number: 60537054 - Page 2 of 11

## EXTENSION OF ITEM 3.D. OF THE INFORMATION PAGE

Policy Number: WC  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                    Effective Date:  04/01/2012

| | |
|---|---|
| WC310319F | NY CONSTRUCTION CLASSIFICATION PREM ADJ |
| WC310617A | NY FOREIGN VOL COMP & EMP LIAB COV ENDT |
| WC53631 | NY ACKNOWLEDGMENT OF RESPONSIBILITY |
| WC993102N | NY NOTICE TO POLICY HOLDER |
| WC993103A | NY AMEND ENDT ADDENDUM  WC990002A(01/02) |
| WC993107 | NY NOTICE TO POLICYHOLDER |
| WC993118 | NY SF FUND SCH NOT - IMP NOT TO PHOLDERS |
| WC320301B | NC AMENDED COVERAGE ENDORSEMENT |
| WC320602 | NC - PRO RATA CANCELLATION ENDT |
| WC993203 | NC AMND ENDT-CANC ADDN TO LOSS REIM ENDT |
| WC993302 | ND AMENDATORY ENDT. |
| 97531 | OH - CANC/NR ENDORSEMENT |
| WC340301C | OH EMPLOYERS LIABILITY COVERAGE |
| WC993402 | OH - WC COVERAGE EXCLUSION ENDT |
| LWNOR | OR NOTICE TO WC INSURANCE POLICY HOLDERS |
| PNOREOR | OR - OPTION REIMB MEDICAL EXPENSES |
| WC360301 | OR UNSAFE EQUIPMENT EXCLUSION ENDT |
| WC360306 | OREGON LIMITS OF LIABILITY ENDT. |
| WC360406 | OR PREMIUM DUE DATE ENDORSEMENT |
| WC360601E | OR - CANCELLATION ENDORSEMENT |
| WC360602 | OR - CONFIDENTIALITY ENDT |
| WC993603B | OR NOTIFICATION OF LOSS CONTROL SERVICES |
| WC370601 | PA INSPECTION OF MANUALS |
| WC370602 | PA NOTICE |
| WC370603A | PA ACT 86-1986 ENDORSEMENT |
| WC993703A | PA NOTIFICATION OF AVAILABILITY |
| WC994101 | TN DRUG-FREE WORKPLACE PREM CREDIT ENDT |
| WC994102 | WAIVER OF OUR RIGHT TO RECOVER - TN |
| WC420301F | TEXAS AMENDATORY ENDT. |
| WC420304A | TEXAS WAIVER OF OUR RIGHT TO RECOVER END |
| WC420407 | TX AUDIT PREMIUM AND RETRO PREMIUM ENDT. |
| WC994202A | TX AMENDATORY ENDT ADDENDUM TO WC990002A |
| WC430305 | UTAH WAIVER OF SUBROGATION ENDORSEMENT |
| WC430602 | UTAH CANCELLATION ENDORSEMENT |
| WC58977 | UT FRAUD NOTICE |
| WC994301A | UT AMENDATORY ENDT ADDENDUM TO WC990002A |
| LWNINPH | VA NOTICE TO POLICYHOLDERS |
| WC450602 | VA AMENDATORY ENDORSEMENT |
| WC470601 | WV CANCELLATION ENDORSEMENT |
| WC994702 | WV - EMP LIAB BROAD FORM |
| WC490301 | WY AMENDATORY ENDORSEMENT |
| WC990610 | NAMED INSUREDS/ADDRESSES |

WC 99 06 12
(Ed. 1/97) (Rev'd 04/08)

Page 1 of 1

## EXTENSION OF ITEM 4. OF THE INFORMATION PAGE

| WC   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 | TEXAS | 910524917 |
|---|---|---|
| Policy Prefix & No. | Schedule | INTRA/Independent State Risk ID |

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-20        SAVAGE SERVICES CORPORATION

| Item 4. Classification of Operations | | Code No. | Premium Basis<br>Estimated Total<br>Annual Remuneration | Rates<br>Per $100 of<br>Remuneration | Estimated<br>Annual Premiums |
|---|---|---|---|---|---|
| RATING GROUP: 0045-01 | | | | | |
| TRUCKING: NOC - ALL EMPLOYEES - &<br>DRIVERS | | 7219 | ▆▆▆▆ | 12.42 | ▆▆▆▆ |
| FREIGHT HANDLER NOC: COVERAGE UNDER<br>STATE ACT ONLY | | 7360 | ▆▆▆ | 7.64 | ▆▆▆▆ |
| FREIGHT HANDLER NOC: COVERAGE UNDER<br>STATE ACT ONLY | | 7360F | IF ANY | 12.30 | |
| FREIGHT HANDLER NOC: COVERAGE UNDER<br>STATE ACT ONLY | | 7360V | IF ANY | 7.64 | |
| AUTOMOBILE RENTAL CO: GARAGE EMPLOYEES | | 8385 | ▆▆▆ | 6.28 | ▆▆▆ |
| SALESPERSONS, COLLECTORS OR MESSENGERS<br>- OUTSIDE | | 8742 | | 0.50 | |
| CLERICAL OFFICE EMPLOYEES NOC | | 8810 | ▆▆▆ | 0.32 | |
| STATE OF TEXAS TOTALS | | | | | ▆▆▆▆ |
| TOTAL CLASSIFICATION PREMIUM | | | | | |
| BLANKET WAIVER | 2.00% | 0930 | | | ▆▆▆ |
| INCREASE LIMITS | 2.00% | 9812 | | | |
| TOTAL UNMODIFIED PREMIUM | | | | | |
| EXPERIENCE PREMIUM      (ACTUAL) | 0.6400 | 9898 | | | |
| SCHEDULE MODIFICATION | -40.00% | 9887 | | | |
| MODIFIED STANDARD PREMIUM | | | | | |
| UNDISCOUNTED PREMIUM | | | | | |
| LOSS REIMB PLAN (NON-FEDERAL) | -57.38% | 9864 | | | |
| DISCOUNTED PREMIUM | | | | | |
| USL&H MINIMUM DIFFERENCE | | 0993 | | | |
| FOREIGN TERRORISM (TRIA) | 0.024 | 9740 | | | |
| TOTAL ESTIMATED PREMIUM | | | | | |
| TOTAL DUE | | | | | ▆▆▆ |
| EXPERIENCE RATING MODIFICATION = 0.64 | | | | | |
| TOTAL PREMIUM FOR TERRORISM COVERAGE INCLUDED<br>IN TOTAL ESTIMATED PREMIUM | | ▆▆▆▆ | | | |

WC 7754 (Ed. 4-81) (Rev'd 04/08)

Certified Document Number: 60537054 - Page 4 of 11

## TEXAS AMENDATORY ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM   04/01/2012            forms a part of Policy No. WC     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

Issued to SAVAGE SERVICES CORPORATION

By THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA

This endorsement applies only to the insurance provided by the policy because Texas is shown in Item 3.A. of the Information Page.

### GENERAL SECTION

B.  **Who Is Insured** is amended to read:

You are insured if you are an employer named in Item 1 of the Information Page. If that employer is a partnership or joint venture, and if you are one of its partners or members, you are insured, but only in your capacity as an employer of the partnership's or joint venture's employees.

D.  **State** is amended to read:

State means any state or territory of the United States of America, and the District of Columbia.

### PART ONE—WORKERS COMPENSATION INSURANCE

E.  **Other Insurance** is amended by adding this sentence:

This Section only applies if you have other insurance or are self-insured for the same loss.

F.  **Payments You Must Make**

This Section is amended by deleting the words "workers compensation" from number 4.

H.  **Statutory Provisions**

This Section is amended by deleting the words "after an injury occurs" from number 2.

### PART TWO—EMPLOYERS LIABILITY INSURANCE

C.  **Exclusions**

Sections 2 and 3 are amended to add:

This exclusion does not apply unless the violation of law caused or contributed to the bodily injury.

Section 6 is amended to read:

6.  bodily injury occurring outside the United States of America, its territories or possessions, and Canada. This exclusion does not apply to bodily injury to a citizen or resident of the United States of America, Mexico or Canada who is temporarily outside these countries.

D.  **We Will Defend**

This Section is amended by deleting the last sentence.

### PART FOUR—YOUR DUTIES IF INJURY OCCURS

Number 6 of this part is amended to read:

6.  Texas law allows you to make weekly payments to an injured employee in certain instances. Unless authorized by law, do not voluntarily make payments, assume obligations or incur expenses, except at your own cost.

WC 42 03 01F
(Ed. 1/00)

Certified Document Number: 60537054 - Page 5 of 11

**PART FIVE-PREMIUM**

A.  **Our Manuals** is amended by adding this sentence:

In this part, "our manuals" means manuals approved or prescribed by the Texas Department of Insurance.

C.  **Remuneration**

Number 2 is amended to read:

2.  All other persons engaged in work that would make us liable under Part One (Workers Compensation Insurance) of this policy. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured workers compensation insurance.

E.  **Final Premium**

Number 2 is amended to read:

2.  If you cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.

**PART SIX-CONDITIONS**

A.  **Inspection** is amended by adding this sentence:

Your failure to comply with the safety recommendations made as a result of an inspection may cause the policy to be canceled by us.

C.  **Transfer of Your Rights and Duties** is amended to read:

Your rights and duties under this policy may not be transferred without our written consent. If you die, coverage will be provided for your surviving spouse, or your legal representative. This applies only with respect to their acting in the capacity as an employer and only for the workplaces listed in Items 1 and 4 on the Information Page.

D.  **Cancelation** is amended to read:

1.  You may cancel this policy. You must mail or deliver advance notice to us stating when the cancelation is to take effect.

2.  We may cancel this policy. We may also decline to renew it. We must give you written notice of cancelation or nonrenewal. That notice will be sent certified mail or delivered to you in person. A copy of the written notice will be sent to the Texas Workers' Compensation Commission.

3.  Notice of cancelation or nonrenewal must be sent to you not later than the 30th day before the date on which the cancelation or nonrenewal becomes effective, except that we may send the notice not later than the 10th day before the date on which the cancelation or nonrenewal becomes effective if we cancel or do not renew because of:

    a.  Fraud in obtaining coverage;

    b.  Misrepresentation of the amount of payroll for purposes of premium calculation;

    c.  Failure to pay a premium when payment was due;

    d.  An increase in the hazard for which you seek coverage that results from an action or omission and that would produce an increase in the rate, including an increase because of failure to comply with reasonable recommendations for loss control or to comply within a reasonable period with recommendations designed to reduce a hazard that is under your control;

    e.  A determination by the Commissioner of Insurance that the continuation of the policy would place us in violation of the law, or would be hazardous to the interests of subscribers, creditors, or the general public.

3.  If another insurance company notifies the Texas Workers' Compensation Commission that it is insuring you as an employer, such notice shall be a cancelation of this policy effective when the other policy starts.

**WC 42 03 01F**
**(Ed. 1/00)**

Page 2 of 3

Certified Document Number: 60537054 - Page 6 of 11

**PART SEVEN-OUR DUTY TO YOU FOR CLAIM NOTIFICATION**

**A. Claims Notification**

We are required to notify you of any claim that is filed against your policy. Thereafter we shall notify you of any proposal to settle a claim or, on receipt of a written request from you, of any administrative or judicial proceeding relating to the resolution of a claim, including a benefit review conference conducted by the Texas Workers' Compensation Commission. You may, in writing, elect to waive this notification requirement.

We shall, on the written request from you, provide you with a list of claims charged against your policy, payments made and reserves established on each claim, and a statement explaining the effect of claims on your premium rates. We must furnish the requested information to you in writing no later than the 30th day after the date we receive your request. The information is considered to be provided on the date the information is received by the United States Postal Service or is personally delivered.

**COMPLAINT NOTICE:** SHOULD ANY DISPUTE ARISE ABOUT YOUR PREMIUM OR ABOUT A CLAIM THAT YOU HAVE FILED, CONTACT THE AGENT OR WRITE TO THE COMPANY THAT ISSUED THE POLICY. IF THE PROBLEM IS NOT RESOLVED, YOU MAY ALSO WRITE THE TEXAS DEPARTMENT OF INSURANCE, P.O. BOX 149091, AUSTIN, TEXAS 78714-9091, FAX # (512)475-1771. THIS NOTICE OF COMPLAINT PROCEDURE IS FOR INFORMATION ONLY AND DOES NOT BECOME A PART OR CONDITION OF THIS POLICY.

WC 42 03 01F
(Ed. 1/00)

Countersigned by _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Page 3 of 3                                    Authorized Representative

Certified Document Number: 60537054 - Page 7 of 11

**TEXAS WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT**

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  04/01/2012         forms a part of Policy No. WC    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

Issued to SAVAGE SERVICES CORPORATION

By THE  INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA

This endorsement applies only to the insurance provided by the policy because Texas is shown in Item 3.A. of the Information Page.

We have the right to recover our payments from anyone liable for an injury covered by this policy. We will not enforce our right against the person or organization named in the Schedule, but this waiver applies only with respect to bodily injury arising out of the operations described in the Schedule where you are required by a written contract to obtain this waiver from us.

This endorsement shall not operate directly or indirectly to benefit anyone not named in the Schedule.
The premium for this endorsement is shown in the Schedule.

**Schedule**

1.   (  )  Specific Waiver

     (X)  Blanket Waiver
          Any person or organization for whom the Named Insured has agreed by written contract to furnish this waiver.

2.   Operations:

3.   Premium:
     The premium charge for this endorsement shall be          percent of the premium developed on payroll in con-
     nection with work performed for the above person(s) or organization(s) arising out of the operations described.

4.   Advance Premium:

WC 42 03 04A                       Countersigned by _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
(Ed. 01/00)
                                                                    **Authorized Representative**

Certified Document Number: 60537054 - Page 8 of 11

## TEXAS - AUDIT PREMIUM AND RETROSPECTIVE PREMIUM ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM   04/01/2012          forms a part of Policy No. WC    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

Issued to SAVAGE SERVICES CORPORATION

By THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA

Section D of Part Five of the policy is replaced by the following provision:

### PART FIVE - PREMIUM

D.    Premium Payments

You will pay all premium when due. You will pay the premium even if part or all of a workers' compensation law is not valid.  The billing statement or invoice for audit additional premiums and/or retrospective additional premiums establishes the date that the premium is due.

Certified Document Number: 60537054 - Page 9 of 11

WC 42 04 07
(Ed. 03/02)

Countersigned by _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Authorized Representative

## TEXAS AMENDATORY ENDORSEMENT ADDENDUM TO LOSS
### REIMBURSEMENT ENDORSEMENT
#### FORM NO. WC990002A (Ed. 1/02)

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  04/01/2012          forms a part of Policy No. WC   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

Issued to SAVAGE SERVICES CORPORATION

By THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA

This Endorsement applies only to work in the state shown on the Schedule.

**Section I. Payment and Reimbursement Conditions, Paragraph D. Aggregate Limit, Sub-Paragraph 2.** is deleted in its entirety and replaced with the following:

2.   If this policy or this endorsement is cancelled by you before the end of the policy period for any reason except your retirement from business, the final Aggregate Limit will be determined as follows:

   a.   The Aggregate Limit for full annual term will be determined by applying the annual Aggregate Limits Basis according to Item I. Above.

   b.   The resulting Aggregate Limit will be subdivided by state in proportion to the earned Standard Premium by state.

   c.   The portion of the Aggregate Limit allocated to Texas shall be reduced pro rata for the period of time that the policy or endorsement was in force.

   d.   All states' portions of the Aggregate Limit, including the reduced Texas portion, shall be summed to determine the final Aggregate Limit.

For Purposes of this Policy **Section II. General Conditions, Paragraph E. Commutation**, does not apply to the portion of the risk in Texas.

All other terms, conditions and exclusions remain unchanged.

WC 99 42 02A
(Ed. 03/02)

Countersigned by _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**Authorized Representative**

## EXTENSION OF ITEM 1. OF THE INFORMATION PAGE

This endorsement, effective 12:01 AM 04/01/2012

Forms a part of policy no.: WC    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

Issued to: SAVAGE SERVICES CORPORATION

By: THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA

| LOC NO. | NAME AND ADDRESS SCHEDULE | FEIN | UI # |
|---|---|---|---|
| 0123 | SAVAGE REFINERY SERVICES, LLC<br>3600 BAYWAY DRIVE<br>BAYTOWN, TX 77522-0000<br>BUSINESS TYPE: LIMITED LIABILITY PARTNERSHIP<br>NAIC: 493110 | 204541523 | |
| 0124 | SAVAGE REFINERY SERVICES, LLC<br>2555 SAVANNAH<br>PORT ARTHUR, TX 77640-0000<br>BUSINESS TYPE: LIMITED LIABILITY PARTNERSHIP<br>NAIC: 493110 | 204541523 | |
| 0125 | SAVAGE REFINERY SERVICES, LLC<br>1301 LOOP 197<br>TEXAS CITY, TX 77592-0000<br>BUSINESS TYPE: LIMITED LIABILITY PARTNERSHIP<br>NAIC: 493110 | 204541523 | |
| 0126 | SAVAGE SERVICES CORPORATION<br>209 TAFT EXTENSION<br>PORT ARTHUR, TX 77643-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 493110 | 870237425 | |
| 0127 | SAVAGE SERVICES CORPORATION<br>28091 SOUTH 3500 EAST<br>OURAY, UT 84026-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 493110 | 870237425 | |
| 0128 | SAVAGE SERVICES CORPORATION<br>2025 E 5000 SO<br>PRICE, UT 84501-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 493110 | 870237425 | |
| 0129 | SAVAGE SERVICES CORPORATION<br>1304 WEST 1170 NORTH<br>OREM, UT 84057-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 493110 | 870237425 | |
| 0130 | SAVAGE SERVICES CORPORATION<br>DBA : SAVAGE TRANSPORTATION COMPANY<br>1023 SOUTH WALNUT<br>CASPER, WY 82601-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 493110 | 870237425 | |

CONTINUED NEXT PAGE

Issue Date: 04/27/12

WC990610 (Ed. 1-97) (Rev'd 04/08)

Certified Document Number: 60537054 - Page 11 of 11



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   April 25, 2014

Certified Document Number:        60537054 Total Pages:  11

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

Certified Document Number: 60537055 - Page 1 of 2

**2014-22667 / Court: 125**

**ACORD®**

## CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
03/27/2012

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Marsh USA Risk & Insurance Services<br>15 West South Temple, Suite 700<br>Salt Lake City, UT 84101<br>Attn: Chris Brimhall (801) 533-3627 | PHONE (A/C, No. Ext): | | FAX (A/C, No): |
| | E-MAIL ADDRESS: | | |
| | **INSURER(S) AFFORDING COVERAGE** | | **NAIC #** |
| | INSURER A : National Union Fire Ins Co Pittsburgh PA | | 19445100 |
| INSURED | INSURER B : Insurance Company Of The State Of PA | | 19429100 |
| SAVAGE REFINERY SERVICES, LLC<br>6340 SOUTH 3000 EAST, SUITE 600<br>SALT LAKE CITY, UT 84121 | INSURER C : Chubb Custom Insurance Company | | 38989 |
| | INSURER D : Commerce And Industry Ins Co | | 19410 |
| | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES**    **CERTIFICATE NUMBER:** SEA-002245442-08    **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | COMMERCIAL GENERAL LIABILITY | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | CLAIMS-MADE ☐ OCCUR | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | | | GENERAL AGGREGATE | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | POLICY ☐ PRO-JECT ☐ LOC ☐ | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** | | | CA0948599 | 04/01/2012 | 04/01/2013 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS / SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS / NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED ☐ RETENTION $ | | | | | | | $ |
| B | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | | | WC009876293 | 04/01/2012 | 04/01/2013 | X WC STATU-TORY LIMITS ☐ OTH-ER | |
| B | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | Y/N N | N/A | WC009876292 (CA) | 04/01/2012 | 04/01/2013 | E.L. EACH ACCIDENT | $ 1,000,000 |
| D | (Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | WC009876294 (FL) | 04/01/2012 | 04/01/2013 | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C | Pollution - Primary | | | 37313254 | 04/01/2010 | 04/01/2013 | Each Claim / Aggregate | 5,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
EXXON MOBILE GLOBAL SERVICES COMPANY IS INCLUDED AS ADDITIONAL INSURED ON AUTO LIABILITY AS REQUIRED BY WRITTEN CONTRACT OR AGREEMENT. WAIVER OF SUBROGATION APPLIES IN FAVOR OF CERTIFICATE HOLDER AS REQUIRED BY WRITTEN CONTRACT OR AGREEMENT. THIS INSURANCE SHALL BE PRIMARY AND NON-CONTRIBUTORY AND LIMITED TO LIABILITY ARISING OUT OF THE OPERATIONS OF THE NAMED INSURED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| EXXON MOBILE GLOBAL SERVICES COMPANY<br>CENTRAL ACCESS AUTHORIZATION COORDINATOR<br>PO BOX 3950<br>BAYTOWN, TX 77522-3950 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>of Marsh USA Risk & Insurance Services<br><br>Chris Brimhall     *Chris Brimhall* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)     The ACORD name and logo are registered marks of ACORD



EXHIBIT
3

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
04/03/2012

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

**IMPORTANT:** If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Marsh USA Risk & Insurance Services<br>15 West South Temple, Suite 700<br>Salt Lake City, UT 84101<br>Attn: Chris Brimhall (801) 533-3827 | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| | E-MAIL ADDRESS: | | |
| | **INSURER(S) AFFORDING COVERAGE** | | **NAIC #** |
| | INSURER A : Charlis Insurance UK Limited | | |
| INSURED<br>SAVAGE REFINERY SERVICES, LLC<br>6340 SOUTH 3000 EAST, SUITE 600<br>SALT LAKE CITY, UT 84121 | INSURER B : N/A | | N/A |
| | INSURER C : Starr Indemnity & Liability Company | | 38318 |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES**     **CERTIFICATE NUMBER:** SEA-002245447-07     **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** | | | CU001155b | 04/01/2012 | 04/01/2013 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ COMMERCIAL GENERAL LIABILITY | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | ☐ CLAIMS-MADE ☒ OCCUR | | | | | | MED EXP (Any one person) | $ |
| | ☒ MARINE GENERAL LIABILITY | | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| C | ☒ **UMBRELLA LIAB** ☒ OCCUR | | | MASILSE00005012 | 04/01/2012 | 04/01/2013 | EACH OCCURRENCE | $ 10,000,000 |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 10,000,000 |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**   Y/N | | | | | | ☐ WC STATU-TORY LIMITS ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ N/A<br>(Mandatory in NH) | | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)**
EXXON MOBILE GLOBAL SERVICES COMPANY IS INCLUDED AS ADDITIONAL INSURED ON MARINE GENERAL LIABILITY AS REQUIRED BY WRITTEN CONTRACT OR AGREEMENT.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| EXXON MOBILE GLOBAL SERVICES COMPANY<br>CENTRAL ACCESS AUTHORIZATION COORDINATOR<br>PO BOX 3950<br>BAYTOWN, TX 77522-3950 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>of Marsh USA Risk & Insurance Services<br>Chris Brimhall     *Chris Brimhall* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)     The ACORD name and logo are registered marks of ACORD

Certified Document Number: 60537055 - Page 2 of 2



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   April 25, 2014

Certified Document Number:        60537055 Total Pages:  2

*Chris Daniel*

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com